[No. B205337. Second Dist., Div. Five. Feb. 9, 2009.]

JERRY JAMGOTCHIAN, Plaintiff and Appellant, v. GEORGE D. SLENDER, Defendant and Respondent.

## COUNSEL

Caswell & Associates and Ronald S. Caswell for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, James M. Humes, Chief Assistant Attorney General, James M. Schiavenza, Assistant Attorney General, Joel A. Davis and Albert Y. Muratsuchi, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**KRIEGLER, J.**—Plaintiff and appellant Jerry Jamgotchian appeals from a judgment following an order granting summary judgment in favor of defendant and respondent George D. Slender. Jamgotchian, the owner of a horse named John's Kinda Girl (JKG), contends a triable issue of fact exists as to whether Slender, a racing steward, is liable for trespass to chattels based on his actions preventing Jamgotchian from retrieving JKG from the Del Mar Race Track grounds and requiring that the horse be raced against Jamgotchian's wishes. We reverse, holding that triable issues of fact exist and no immunity applies to Slender's actions.

## FACTS AND PROCEDURAL BACKGROUND

*Slender's Summary Judgment Motion*

On December 21, 2005, Jamgotchian filed a complaint against Slender and Mark Glatt, JKG's trainer, for trespass to chattels and injunctive relief based

on allegations that they raced JKG against his express instructions. An amended complaint was filed on January 30, 2006. On September 14, 2006, Slender filed a motion for summary judgment on the grounds that Jamgotchian could not establish the elements of trespass to chattels and Slender had immunity under Government Code section 820.2. On November 14, 2006, Jamgotchian filed an opposition to the motion for summary judgment on the grounds that Slender acted outside his authority, intentionally interfered with Jamgotchian's possession of JKG, and no immunity applied.

The undisputed evidence submitted in connection with the summary judgment pleadings showed the following facts. Slender has been a racing steward appointed by the California Horse Racing Board (CHRB) for more than 33 years. Jamgotchian is licensed by the CHRB and owns more than 100 thoroughbred race horses, including JKG.

In August 2005, Jamgotchian and Glatt discussed potential races for JKG. They preferred a race scheduled to be held at Del Mar on August 17, 2005. Their second choice was a stakes race in Seattle, Washington on August 21, 2005, for which JKG had been nominated. Their third choice was a stakes race at Del Mar on September 1, 2005. Their fourth choice was a race scheduled to be held at Del Mar on August 14, 2005.

On August 12, 2005, Glatt went to the racing secretary's office and spoke with Assistant Racing Secretary Rick Hammerle. Glatt explained that he wanted to enter JKG in the August 17 race, but the race did not yet have enough horses entered to go forward. He asked about conditionally entering JKG in the August 14 race.

The deadline to request to withdraw a horse from a race is called the "scratch time." The scratch time for the August 14 race was 9:30 a.m. on August 13, 2005. In general, after the scratch time has passed, a horse may not be entered in another race unless the horse is excused from the first race by the stewards. However, a horse may be scratched from a race and entered into a stakes race without obtaining the permission of the stewards. Glatt would not know whether the August 17 race was going forward before the scratch time for the August 14 race.

In order to get race cards filled and generate additional revenue for the racetrack and the horsemen, it is a long-standing practice of the racing secretary's office to solicit and accept "provisional" entries that allow the licensee to scratch a horse from the race. The racing secretary is a Del Mar track official and not a CHRB employee. The racing secretary's office does not represent the CHRB. However, when the racing secretary's office has accepted a provisional entry, the stewards routinely permit the licensee to scratch the horse.

Hammerle told Glatt that the racing secretary's office would contact the stewards and make arrangements for a provisional entry. If the August 17 race did not fill, then JKG would stay in the August 14 race. Hammerle did not contact the stewards, because he did not think the August 17, 2005 race had any chance of going forward. If it did fill, Hammerle felt confident that he could explain the situation to the stewards and persuade them to scratch JKG on the entry day in favor of the later race. Therefore, the conditional entry was not discussed with or approved by any of the stewards.

On August 14, 2005, Slender was one of three stewards on the board of stewards which supervised the horse racing meeting at the track. He was the duty steward, which meant he reported early and was responsible for handling entries and scratches before the other stewards arrived.

At 9:30 a.m., Jamgotchian told Glatt that he wanted JKG withdrawn from the August 14 race in order to enter JKG in the stakes race in Seattle. Glatt called and spoke to Slender to request a scratch of JKG from the race. Glatt said JKG had no physical infirmities and was sound and fit to race.

Slender stated: "We are not going to allow any horse owner to control our multi-million-dollar business. You're obligated to run. If you do not race the horse, you are . . . being threatened with a 60-day suspension of your license." Glatt responded with disbelief and tried to explain the situation Slender was putting him in, but Slender was steadfast in his decision.

At 10:30 a.m., Jamgotchian spoke to Racing Secretary Tom Robbins. Another horse had already scratched from the August 14 race and Robbins wanted to keep the race intact as best he could, but Robbins found Jamgotchian's reasons for withdrawing JKG compelling. Robbins agreed to tell the stewards that the racing office would find the scratch acceptable, but he warned Jamgotchian that it was the stewards' decision whether to scratch the horse.

At 10:45 a.m., Robbins called Slender. Robbins explained the arrangement discussed between Glatt and Hammerle. He also explained that although the August 17, 2005 race had failed to fill, Jamgotchian and Glatt still wanted to scratch JKG in order to run in a race the following weekend in Seattle. He told Slender that the racing department would find it acceptable if the stewards withdrew JKG. Slender responded that JKG would be running in the August 14 race. Robbins told Jamgotchian that Slender would not permit a scratch.

Jamgotchian and Glatt called Slender again. Based on information from Glatt, Jamgotchian told Slender that JKG had an injured heel that would be

better with a few more days of rest. JKG was coming off the veterinarian's list for a similar injury. Slender responded that the horse was obligated to race, he would not permit a veterinarian's scratch because Glatt had told him earlier that the horse was fine, the horse was ready to run, and Slender had ordered her to run. Jamgotchian explained the myriad reasons why he believed the posted scratch time did not apply, insisted that the horse was not going to race at Del Mar that day, and stated that he would remove JKG from the Del Mar grounds before the race.

Slender told Glatt that if he did not saddle and race JKG that day, he would be immediately fined and immediately have his trainer's license suspended for a period of 30 to 60 days. Glatt told Slender that any suspension would effectively put him out of business. Slender said that he would immediately fine Jamgotchian and suspend his owner's racing license, as well as bar all of his horses from racing anywhere in California, which would effectively put Jamgotchian's racehorse operation out of business in California. As a long-time licensee, Jamgotchian was aware that a steward acting alone may not lawfully impose punishment. Even acting as a board, the board of stewards may not impose a fine or suspension on a licensee without first conducting a full and impartial hearing with a court reporter, providing the licensee with notice of the hearing and an opportunity to be heard. Jamgotchian told Slender that he was being unfair to Glatt and asked that Slender not fine or suspend Glatt, because Jamgotchian had made the determination to scratch the horse. Slender repeated his threats. Slender told Glatt that racetrack security would not permit the horse to leave the grounds.

Slender told the other stewards on the board that Jamgotchian wanted to run JKG in a stakes race in Seattle. He did not tell them that the horse had been conditionally entered in a race later in the week at Del Mar. He did not tell them that the racing secretary had called him and said the racing department would find it acceptable if the stewards scratched the horse because of the provisional entry. He told them that he said there would possibly be a penalty imposed if Glatt did not run the horse. The stewards discussed the request, found no valid reason to scratch JKG, and unanimously voted that the horse was obligated to race under California Code of Regulations, title 4, section 1602.[1]

About 11:00 a.m., Slender called CHRB investigator Douglas Aschenbrenner and asked him to prevent Jamgotchian from taking JKG off the Del Mar grounds. Slender told Aschenbrenner that Jamgotchian wanted to scratch JKG and run the horse somewhere else, but he did not want that. Slender said to

---

[1] All further references to California Code of Regulations, title 4, are indicated as Regulations followed by the section number.

go to the barn to make sure the horse did not leave the grounds. Aschenbrenner asked, "How far [do] you want me to go with this?" Slender paused and said, "We want the horse to race." Aschenbrenner asked, "George, why don't you just let him scratch and fine him the $300?" Three hundred dollars was the typical fine imposed by the stewards for a late scratch. Slender replied, "No. I'm going to suspend him for 30 days." Aschenbrenner told Slender that the investigators "don't normally get involved with that," but he would go to the barn. Slender instructed him to make sure that the horse was raced.

Aschenbrenner went to the barn to confirm that the horse was still stabled at Del Mar. After Aschenbrenner left the barn, he contacted the security guard at the gate to ensure that the horse did not leave the Del Mar grounds, in accordance with Slender's instructions. He also asked the racetrack staff to post a security guard at Glatt's barn.

Jamgotchian and Glatt decided that in order to protect Glatt from a potentially devastating suspension, Jamgotchian would terminate Glatt, effective immediately. Jamgotchian called trainer Peter Miller. Miller has the use of a trailer and occasionally hauls his own horses. Jamgotchian asked Miller to pick up JKG, take her to San Luis Rey Downs, and train her.

At noon, Jamgotchian called Glatt and said, "I'm officially terminating you, and I'm going to be having a van company come and pick my horse up." He faxed Glatt a notice of termination, effective immediately, which stated that he was making arrangements to have JKG shipped out of Del Mar immediately. Jamgotchian faxed a copy of Glatt's termination notice to the stewards. Glatt accepted the termination and agreed to prepare JKG for departure from the Del Mar grounds. Once a trainer is terminated, the trainer's insurance no longer covers the jockey or other employees of the trainer. However, the stewards refused to recognize the termination and transfer JKG from Glatt to another trainer.

Miller spoke to Jamgotchian and said he could not pick up JKG until the following day. Jamgotchian explained that he needed Miller to pick up JKG because he had fired Glatt.

At 1:45 p.m., Jamgotchian sent a fax to several people, including CHRB Assistant Executive Director Roy Minami, the stewards, and Glatt, informing them that JKG would not run in the race that day and threatening to commence litigation if the horse was raced against his authority. He stated that he was going to remove JKG, as well as all of his other horses, from the property. No one responded to Jamgotchian's faxes and telephone calls.

Two CHRB investigators were posted at the barn at 2:00 p.m. to make sure the horse did not leave the barn. A race security person was also posted at the

barn. Glatt believed racetrack security was not going to allow the horse to be shipped off the grounds and would not have allowed the horse out of the gate if an attempt had been made.

At 2:43 p.m., Glatt told Jamgotchian that Slender had placed a CHRB investigator and a security guard in front of JKG's stall to prevent Jamgotchian from removing the horse. Glatt also told him that the guard would not allow anyone into the stall. Glatt said he had decided to cooperate with Slender and would not remove JKG from the stall or deliver her to the van that Jamgotchian had hired to retrieve the horse.

At 4:00 p.m., Jamgotchian faxed a letter to the stewards stating that he had learned from Glatt that JKG would not be allowed to leave Del Mar. He asked to make arrangements to have the horse removed within the hour. At 4:15 p.m., Jamgotchian faxed a letter to the stewards again requesting permission to scratch JKG from the race and to remove her from Del Mar. He received no response to the faxes or to telephone messages.

When a horse that Glatt trains is racing, his employees are told which race the horse is in and they take it upon themselves to prepare the horse. Around 4:20 p.m., in the ordinary course of business, a groom employed by Glatt removed JKG from her stall and took her to the "receiving barn" where the horses are identified, and then to the paddock to be prepared to race.

Miller arranged for a commercial van company to pick up the horse. Jamgotchian called Glatt at 4:30 p.m. and said he had arranged for a shipping company to pick up the horse. At 4:33 p.m., he sent a fax to the stewards stating that he had a shipping company waiting to pick up JKG and remove her from the Del Mar grounds, but no one had contacted him and authorized her to leave. He pleaded for someone to contact him so that he could get his horse immediately.

At 4:40 p.m., Glatt saddled JKG in the paddock. At 5:00 p.m., JKG raced. Miller saw JKG run the race. Afterward, Miller saw JKG get on the van, which took the horse to Miller's barn at San Luis Rey Downs. Running in the race injured JKG's front foot and caused her to be lame.

The trial court denied Slender's motion for summary judgment on the grounds that he had no authority to take control and run the horse, and no immunity applied, because Slender had acted outside the powers entrusted to his discretion.

*Additional Proceedings*

On November 13, 2006, Slender filed a motion for judgment on the pleadings on the ground that Jamgotchian failed to comply with the claim

presentation requirement of the Government Claims Act (Gov. Code, § 810 et seq.). Jamgotchian filed an opposition to the motion for judgment on the pleadings on the grounds that Slender was an independent contractor, and the claim presentation requirements therefore did not apply. Slender filed an amended motion for judgment on the pleadings adding an argument that Jamgotchian had failed to allege exhaustion of administrative remedies. The trial court granted the amended motion for judgment on the pleadings and granted Jamgotchian leave to amend the complaint to allege compliance with the available administrative remedy. Jamgotchian filed a second amended complaint, which included allegations that he had exhausted his administrative remedies.

On May 14, 2007, Jamgotchian filed a motion for summary adjudication on the issue of liability based on facts that the trial court found to be undisputed in ruling on Slender's motion for summary judgment. On June 12, 2007, Slender filed a second motion for summary judgment on the ground that Jamgotchian failed to exhaust his administrative remedies and failed to present a claim.

Slender opposed Jamgotchian's motion for summary adjudication on the grounds that the trial court could not grant summary adjudication without ruling on Slender's motion for summary judgment based on affirmative defenses to liability and triable issues of fact existed as to whether Slender intentionally interfered with Jamgotchian's use or possession of his horse.

Jamgotchian opposed Slender's motion for summary judgment on the grounds that he exhausted his administrative remedies and Slender was an independent contractor not subject to the Government Claims Act.

The following additional evidence was submitted in connection with Jamgotchian's summary adjudication motion and Slender's second motion for summary judgment.

Slender submitted his declaration stating in pertinent part that he never ordered Glatt to race the horse and never threatened Glatt with immediate discipline without a hearing, because he was aware that he did not have the legal authority to do so. When the stewards received the notification of Glatt's termination, they unanimously agreed not to grant a transfer of JKG. Instead, Glatt would remain as the official trainer of record for JKG and shared the legal obligation to race the horse. In the early afternoon, Glatt told Slender that Jamgotchian intended to send a crew to remove JKG from the premises. Slender had the impression that Glatt was worried about a confrontation. To prevent a confrontation and ensure the orderly conduct of the race meeting, Slender requested a CHRB investigator stand watch outside JKG's

barn. However, he never instructed the investigator or anyone else to prevent Jamgotchian from removing his horse from the racetrack. Slender did not learn until after the race that Jamgotchian claimed to have an agreement with the racing secretary for a conditional entry that allowed him to scratch his horse after the deadline had passed. He never threatened to fine or suspend Jamgotchian.

After Glatt's termination, he consulted with his attorney, Steve Sobel. Sobel called Ingrid Fermin (Executive Director of CHRB), Slender and others to intercede on Glatt's behalf between noon and 1:00 p.m. Slender submitted Glatt's declaration in opposition to Jamgotchian's motion for summary adjudication stating that Glatt called Jamgotchian in the morning on August 14, 2005, to tell him that the race they wanted was not going to go forward. Jamgotchian wanted JKG scratched from the August 14 race. Glatt said he would have to get a veterinarian's scratch, which Jamgotchian did not want. Jamgotchian said he would call the stewards and obtain a scratch. However, Jamgotchian called Glatt back and said that the stewards would not let him scratch JKG without a valid reason. Glatt called Slender to facilitate a compromise. Jamgotchian was a new client for Glatt who owned many horses and Glatt's goal was to foster a long-term relationship with Jamgotchian. He learned for the first time that Jamgotchian had previously nominated JKG to run in a stakes race in Washington. At the time that Jamgotchian sought to scratch JKG, the horse had not been entered to race in the stakes race in Washington. Slender denied the request to scratch JKG, said Glatt was obligated to run JKG and if he did not, he would be suspended for 30 to 60 days. Glatt called Jamgotchian, but they could not think of a solution. Jamgotchian called back and engaged Glatt and Slender in a telephone conference call. Slender remained firm in his decision. Glatt, Hammerle, and Jamgotchian also had a telephone conference call. Hammerle refused to intercede on Jamgotchian's behalf. Robbins was intermittently on the call. Robbins never agreed that a scratch of JKG was appropriate. When Jamgotchian called Glatt to terminate his services, he told Glatt that he would have JKG shipped back to his care in a week. Based on the threat of suspension, the directive of the stewards to race JKG and the advice of Sobel, Glatt had his staff prepare JKG for the August 14, 2005 race. He never personally removed JKG from her stall and never delivered JKG to Slender at the receiving barn on August 14, 2005. Glatt did not receive the written termination notice or any of Jamgotchian's faxes until after the race.

After a hearing on August 30, 2007, the trial court denied Jamgotchian's motion for summary adjudication. The court found there was no evidence that Slender personally took JKG from her stable, prepared her for the race and delivered her to the racing barn, or that anyone did so under Slender's control and authority. The court found ample evidence to doubt the efficacy of Glatt's termination, and therefore, could not find that Glatt was no longer Jamgotchian's agent when he delivered JKG to the racing barn. Even if the

termination were effective, there was no undisputed evidence from which to conclude that Glatt was Slender's agent. The court also found that "the posting of guards by Slender with instructions to stop Jamgotchian or Jamgotchian's agents from taking JKG from the inclosure was arguably wrong, assuming for purposes of argument that he did so. But it did not result in any actionable harm because (a) no attempt was made to remove JKG from the inclosure before the race, and (b) neither Jamgotchian nor any employee was physically restrained from removing JKG by any of the posted guards." The trial court concluded that Jamgotchian had failed to show that there was no substantial controversy as to the cause of action for trespass to chattels.

The trial court denied Slender's motion for summary judgment. The court found that Jamgotchian had appealed the stewards' decision and exhausted administrative remedies. Moreover, Slender was an independent contractor and not an employee to whom the claims presentation requirement attached.

The trial court addressed the immunity issue raised in the parties' briefs: "While the court continues to hold that the statutes and rules do not authorize a steward to take physical possession of a race horse, the court is now prepared to find that Slender did not take possession of JKG, and, in addition, is further disposed to find (a) that Glatt was not acting as Slender's agent at any time, (b) that Glatt's actions are not imputable to Slender on some theory of duress or compulsion, and (c) that Slender, by posting guards at the stable, did not prevent Jamgotchian from taking JKG out of the inclosure before the race. [¶] Instead, on this record, the court funds that Slender did no more than he was authorized to do: (a) he denied Jamgotchian's request to declare JKG, and (b) he threatened both Jamgotchian and Glatt with fines and suspensions if JKG did not run in the seventh race. [¶] On its own motion, then, the court reconsiders the question of Slender's immunity under Business and Professions Code section 19518, subdivision (b)." The court put the issue on calendar for a hearing and allowed the parties to brief the issue of whether Slender's actions were within his delegated powers.

In response to the trial court's request for briefing, Glatt submitted a supplemental declaration stating that when he told Slender that Jamgotchian had fired him as JKG's trainer, Slender ordered and directed him to saddle and race Jamgotchian's horse. Glatt also submitted Sobel's declaration. Sobel declared that after he spoke to Glatt, he spoke to Slender on Glatt's behalf. He explained that Glatt was caught in the middle of the dispute and Jamgotchian had threatened to sue him if he saddled the horse for the race and the horse raced. Sobel reiterated to Slender that Jamgotchian had fired Glatt as his trainer. Slender responded with words to the effect of "Tell Mark to lead the horse over and we'll take care of him." Sobel told Glatt that Slender had said to lead the horse over and he would be taken care of by the stewards.

On October 15, 2007, the trial court found that Glatt, not Slender, took possession of the horse, and therefore, Slender could not be liable for trespass to chattels. The court granted the motion for summary judgment on this ground and expressly denied the motion on all other grounds. The court entered judgment in favor of Slender on December 21, 2007. Jamgotchian filed a timely notice of appeal.

## DISCUSSION

### I. *Standard of Review*

"A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. [Citation.] We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.] In the trial court, once a moving defendant has 'shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established,' the burden shifts to the plaintiff to show the existence of a triable issue; to meet that burden, the plaintiff 'may not rely upon the mere allegations or denials of its pleadings . . . but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' " (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

### II. *Immunity*

Slender contends he has immunity for his actions, because they were an exercise of his authority under the horse racing regulations. We disagree, because there is a disputed issue of fact as to whether Slender's actions were within his discretionary authority under the California Code of Regulations, title 4.

#### A. *Immunity Under the Government Claims Act*

The Government Claims Act restates a public employee's traditional immunity for discretionary acts in Government Code section 820.2, which provides that "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

■ "Because of the special needs of government and public service, the [Government] Claims Act expressly allows public employees to engage in

certain acts and omissions free of suit, even when they might otherwise be liable for causing injury or violating individual rights. Among the statutory protections afforded is the immunity for discretionary acts, which leaves public officials free of unseemly judicial interference against them personally when they debate and render those basic policy and personnel decisions entrusted to their independent judgment. [Citations.]" (*Caldwell v. Montoya* (1995) 10 Cal.4th 972, 988 [42 Cal.Rptr.2d 842, 897 P.2d 1320] (*Caldwell*).)

■ Because most acts by public employees involve a choice among alternative courses of action, "the statutory immunity thus cannot depend upon a literal or semantic parsing of the word 'discretion.' " (*Caldwell, supra*, 10 Cal.4th at p. 981, citing *Johnson v. State of California* (1968) 69 Cal.2d 782, 787–790 [73 Cal.Rptr. 240, 447 P.2d 352].) As a result, the court has adopted a " 'workable definition' " of immune discretionary acts that draws a distinction between " 'planning' " and " 'operational' " functions of government. (*Caldwell, supra*, at p. 981.) Immunity is granted for " 'basic policy decisions [which have] . . . been [expressly] committed to coordinate branches of government,' and as to which judicial interference would thus be 'unseemly.' [Citation.] Such 'areas of quasi-legislative policy-making . . . are sufficiently sensitive' [citation] to call for judicial abstention from interference that 'might even in the first instance affect the coordinate body's decision-making process' [citation]." (*Ibid.*, italics omitted.)

Ministerial acts "that merely implement a basic policy already formulated" are not entitled to immunity. (*Caldwell, supra*, 10 Cal.4th at p. 981.) Immunity only applies "to *deliberate and considered* policy decisions" involving a conscious balancing of risks and advantages. (*Ibid.*) It is irrelevant that an employee normally engages in discretionary activity " 'if, in a given case, the employee did not render a considered decision.' " (*Ibid.*) For example, "the actions of a deputy public defender in representing an assigned client in a criminal action generally do not involve the type of basic policy decisions that our past decisions have held are within the scope of the immunity afforded by [Government Code] section 820.2. Although such legal representation entails difficult choices among complex alternatives and the exercise of professional skill, for purposes of [Government Code] section 820.2 the attorney's actions ordinarily involve operational judgments that implement the initial decision to provide representation to the client. Holding deputy public defenders accountable at law for legal malpractice in this context does not result in unwarranted judicial interference in the affairs of the other branches of government, but rather simply subjects these public employees to the same principles of tort law applicable to private attorneys performing identical professional services in the same type of proceedings." (*Barner v. Leeds* (2000) 24 Cal.4th 676, 691–692 [102 Cal.Rptr.2d 97, 13 P.3d 704].)

The California Supreme Court has considered the distinction between policy and operational judgments in numerous contexts. "Thus, we have rejected claims of immunity for a bus driver's decision not to intervene in one passenger's violent assault against another (*Lopez* v. *Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 793–795 [221 Cal.Rptr. 840, 710 P.2d 907]), a college district's failure to warn of known crime dangers in a student parking lot (*Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 815 [205 Cal.Rptr. 842, 685 P.2d 1193]), a county clerk's libelous statements during a newspaper interview about official matters (*Sanborn* v. *Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 415–416 [134 Cal.Rptr. 402, 556 P.2d 764]), university therapists' failure to warn a patient's homicide victim of the patient's prior threats to kill her (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 444–447 [131 Cal.Rptr. 14, 551 P.2d 334]), and a police officer's negligent conduct of a traffic investigation once undertaken (*McCorkle* v. *City of Los Angeles* (1969) 70 Cal.2d 252, 261–262 [74 Cal.Rptr. 389, 449 P.2d 453]).

"On the other hand, we have concluded that the discretionary act statute does immunize officials and agencies against claims that they unreasonably delayed regulations under which a murdered security guard might have qualified himself to carry a defensive firearm (*Nunn* v. *State of California* (1984) 35 Cal.3d 616, 622–623 [200 Cal.Rptr. 440, 677 P.2d 846]), or negligently released a violent juvenile offender into his mother's custody (*Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 747–749 [167 Cal.Rptr. 70, 614 P.2d 728])." (*Caldwell, supra*, 10 Cal.4th at pp. 981–982.)

## B. *The Stewards' Authority*

Jurisdiction over horse racing operations in California is vested in the seven-member CHRB. (Bus. & Prof. Code, §§ 19420, 19421.) The CHRB may delegate to duly appointed stewards "any of its powers and duties that are necessary to carry out fully and effectuate the purposes of this chapter." (*Id.*, § 19440, subd. (b).) The CHRB "may prescribe rules [and] regulations . . . under which all horse races with wagering on their results shall be conducted in this State." (*Id.*, § 19562.)

The authority and powers of stewards are set forth in the California Code of Regulations, title 4. Regulations section 1527 provides general authority to the stewards over licensees and the inclosure: "The stewards have general authority and supervision over all licensees and other persons attendant on horses, and also over the inclosures of any recognized meeting. The stewards are strictly responsible to the [CHRB] for the conduct of the race meeting in every particular." Under Regulations section 1542, "For good cause, the stewards may refuse the entry to any race, or declare ineligible to race and

order removed from the premises, any horse." The stewards' authority to impose disciplinary measures is prescribed by Regulations section 1528: "The stewards may suspend the license of anyone whom they have the authority to supervise or they may impose a fine or they may exclude from all enclosures in this State or they may suspend, exclude and fine. All such suspensions, fines or exclusions shall be reported immediately to the [CHRB]." Regulations section 1530 states, "Should any case occur which may not be covered by the Rules and Regulations of the Board or by other accepted rules of racing, it shall be determined by the stewards in conformity with justice and in the interest of racing."

An owner's late withdrawal of a horse from a race is a case that is expressly covered in the rules and regulations. "Any owner, his authorized agent, or trainer of a horse which has been entered for a purse race and has been drawn in to the race and entitled to a post position or is also eligible, who does not wish such horse to start in the race, shall file a request for a declaration not later than the 'scratch time' designated for such race by the stewards. Any horse so declared pursuant to such request shall lose all preferences it has accumulated." (Regs., § 1602.) The stewards may penalize an owner for a late declaration as follows: "No person other than the stewards may declare a horse out of any overnight race after the 'scratch time' designated for such race by the stewards, and the starting of such horse is obligatory. Any person responsible for the failure of any horse to start in a race when the starting of such horse is obligatory may be disciplined by the stewards." (Regs., § 1629.)

### C. *Application of Immunity Under Government Code Section 820.2 to Slender*

It is clear that under the regulations, the starting of a horse entered in an overnight race is obligatory after the scratch time, unless the stewards declare the horse out of the race. The regulatory scheme allows the stewards to discipline any person responsible for the failure of any horse to start in a race when the starting was obligatory. The stewards may take disciplinary actions after the failure to run occurs, limited to fines, suspension or exclusion of the person responsible. But the regulations do not authorize any preemptive action by the stewards to prevent the failure of a horse to start. There is no discretion vested in the stewards to bar an owner from retrieving his or her horse before a race is run.

As discussed more fully below, Jamgotchian presented evidence that Slender acted beyond his authority in ordering JKG to race and taking steps to prohibit removal of the horse from the premises. If the trier of fact finds that Slender dispossessed Jamgotchian of his horse, an act beyond his

authority under the regulations, Slender is not entitled to immunity under provisions of the Government Claims Act based on a proper exercise of discretion.

### D. *Quasi-judicial Immunity*

Slender cannot claim quasi-judicial immunity in this case based on the role of a steward in adjudicating and enforcing horse racing laws and regulations.

■ " '[T]he factors determining whether an act by a judge is a "judicial" one relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity.' [Citation.] A judge is not deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, a judge will be subject to liability only when he has acted in the clear absence of all jurisdiction. [Citations.]" (*Greene v. Zank* (1984) 158 Cal.App.3d 497, 507–508 [204 Cal.Rptr. 770].)

The horse racing regulations provide stewards with authority over licensees and the inclosure, but not the authority to prohibit the removal of a horse from the facility. If Slender prevented Jamgotchian from maintaining possession and control of JKG, such conduct would have been outside the scope of Slender's authority and in the clear absence of jurisdiction. The undisputed facts do not establish that Slender was entitled to the protection of quasi-judicial immunity if he committed a trespass to chattels.

## III. *Trespass to Chattels*

Jamgotchian contends that a triable issue of fact exists as to whether Slender committed trespass to chattels. We agree.

■ "Dubbed by Prosser the 'little brother of conversion,' the tort of trespass to chattels allows recovery for interferences with possession of personal property 'not sufficiently important to be classed as conversion, and so to compel the defendant to pay the full value of the thing with which he has interfered.' (Prosser & Keeton, Torts (5th ed. 1984) § 14, pp. 85–86.)

"Though not amounting to conversion, the defendant's interference must, to be actionable, have caused some injury to the chattel or to the plaintiff's rights in it. Under California law, trespass to chattels 'lies where an intentional interference with the possession of personal property *has proximately caused injury*.' (*Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1566 [54 Cal.Rptr.2d 468], italics added.) In cases of interference with possession

of personal property not amounting to conversion, 'the owner has a cause of action for trespass or case, *and may recover only the actual damages suffered by reason of the impairment of the property or the loss of its use.*' (*Zaslow v. Kroenert* [(1946)] 29 Cal.2d [541,] 551 [176 P.2d 1], italics added; accord, *Jordan v. Talbot* (1961) 55 Cal.2d 597, 610 [12 Cal.Rptr. 488, 361 P.2d 20].) In modern American law generally, '[t]respass remains as an occasional remedy for minor interferences, *resulting in some damage*, but not sufficiently serious or sufficiently important to amount to the greater tort' of conversion. (Prosser & Keeton, Torts, *supra*, § 15, p. 90, italics added.)

■   "The Restatement, too, makes clear that some actual injury must have occurred in order for a trespass to chattels to be actionable. Under section 218 of the Restatement Second of Torts, dispossession alone, without further damages, is actionable (see *id.*, par. (a) & com. d, pp. 420–421), but other forms of interference require some additional harm to the personal property or the possessor's interests in it. (*Id.*, pars. (b)–(d).) 'The interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel. In order that an actor who interferes with another's chattel may be liable, his conduct must affect some other and more important interest of the possessor. *Therefore, one who intentionally intermeddles with another's chattel is subject to liability only if his intermeddling is harmful to the possessor's materially valuable interest in the physical condition, quality, or value of the chattel, or if the possessor is deprived of the use of the chattel for a substantial time, or some other legally protected interest of the possessor is affected as stated in Clause (c).* Sufficient legal protection of the possessor's interest in the mere inviolability of his chattel is afforded by his privilege to use reasonable force to protect his possession against even harmless interference.' (*Id.*, com. e, pp. 421–422, italics added.)" (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1350–1351 [1 Cal.Rptr.3d 32, 71 P.3d 296].)

■   The Restatement Second of Torts, section 217, provides, "A trespass to a chattel may be committed by intentionally [¶] (a) dispossessing another of the chattel, or [¶] (b) using or intermeddling with a chattel in the possession of another." The Restatement Second of Torts, section 221, provides that "A dispossession may be committed by intentionally [¶] . . . [¶] . . . barring the possessor's access to a chattel . . . ."

■   A triable issue of fact exists as to whether Slender's conduct in ordering CHRB investigators and race security staff to prevent Jamgotchian from retrieving his horse was a substantial factor in causing Jamgotchian's harm. Had Jamgotchian been permitted to retrieve JKG, the horse would not have been raced and injured. In addition, Slender's threat to suspend Glatt for

failing to race the horse would have been easier to challenge had the horse been retrieved by Jamgotchian prior to the race. It is for the trier of fact to determine whether Slender intentionally interfered with Jamgotchian's right to possession of JKG in light of Jamgotchian's arrangements for a van and an alternate trainer to pick up the horse; knowledge that Slender had ordered the security officers at the racetrack gate to prevent any attempt to remove JKG; and increasingly frantic attempts to secure approval from race officials to remove the horse from the grounds. A reasonable trier of fact could conclude that Jamgotchian was not required to provoke a confrontation to be dispossessed of the horse under the circumstances of the case.

## DISPOSITION

The judgment is reversed. Appellant Jerry Jamgotchian is awarded his costs on appeal.

Turner, P. J., and Mosk, J., concurred.