[No. G045885. Fourth Dist., Div. Three. Aug. 31, 2012.]

DAVID PLOTNIK et al., Plaintiffs and Respondents, v.
JOHN MEIHAUS, JR., et al., Defendants and Appellants.

[No. G046260. Fourth Dist., Div. Three. Aug. 31, 2012.]

JOHN MEIHAUS, JR., Cross-complainant and Appellant, v.
DAVID PLOTNIK et al., Cross-defendants and Respondents.

1592

## Counsel

Law Offices of Steven R. Young and Jim P. Mahacek for Defendants and Appellants and for Cross-complainant and Appellant.

Donna Bader for Plaintiffs and Respondents and for, Cross-defendants and Respondents.

## Opinion

**RYLAARSDAM, Acting P. J.**—Plaintiffs David and Joyce Plotnik sued their neighbor, defendant John Meihaus, Jr. (Meihaus), and two of his sons, defendants Greg Meihaus and John Meihaus III, alleging both contract and tort claims. In part, plaintiffs sought recovery for the emotional distress they suffered when Meihaus injured their dog. The superior court entered a judgment on jury verdicts that awarded David Plotnik over $175,000 against all defendants and Joyce Plotnik over $255,000 against Meihaus. The awards included emotional distress damages resulting from the dog's injury. In response to defendants' motion for new trial, the superior court entered an amended judgment after plaintiffs accepted a remittitur reducing the damage awards to $146,600 for David Plotnik and $205,209.53 for Joyce Plotnik. The court also granted plaintiffs $93,780 in attorney fees against Meihaus on the breach of contract claim.

Defendants appeal from both the original and amended judgments. While some of their claims have merit, requiring a further reduction of the amended judgment's damage awards, we hold California law allows a pet owner to recover for mental suffering caused by another's intentional act that injures or kills his or her animal.

## FACTS AND PROCEDURAL BACKGROUND

Plaintiffs and their two children moved into a home in Laguna Niguel in 2003. The rear portion of the property slopes upward, abutting the Meihauses' lot. At the time, a three-foot-high fence on the property line separated the two parcels.

Plaintiffs claimed that, shortly after moving into their home, they began to have problems with the Meihaus family. Plaintiffs built a six-foot-high fence along the parcels' common boundary. In response, Meihaus and his wife sued plaintiffs and the community association. That lawsuit was resolved in 2007 by a written settlement. In it, plaintiffs agreed to relocate the rear fence, moving it three feet back from the common boundary. The new fence has a gate that allows plaintiffs access to the portion of their property on the opposite side of the fence.

The settlement agreement contained clauses whereby each party "release[d] and discharge[d]" the other "from any and all claims, demands, or causes of action, known or unknown, which [they] now own or hold, or have at any time . . . heretofore owned . . . ." It also included a mutual restraint provision, stating "[t]he [p]arties . . . agree not to harass, vex or annoy[] each other either personally or by employing or encouragement of another for such purpose. Further neither party shall either verbally or in writing communicate to any other person or entity, whether in the form of purported statement of fact or opinion, any slanderous or disparaging matter concerning the personal or professional character or reputation of any other [p]arty . . . ." The settlement authorized the prevailing party's recovery of its legal expenses "in the event any action, suit or other proceeding . . . is instituted to remedy, prevent or obtain relief from a breach of this Agreement/Release[ or] arising out of a breach of this Agreement/Release . . . ."

At trial, plaintiffs presented evidence of several incidents that occurred between the parties after the settlement. Plaintiffs testified they found yard clippings and trash on their side of the rear fence. They documented some of this activity by taking photographs and saving some of the debris. David Plotnik testified the flower clippings were similar to plants he saw in the Meihauses' backyard.

David Plotnik and his daughter testified that on several occasions when driving through the neighborhood, they saw Meihaus jogging. As they passed him, Meihaus often raised a fist and extended his middle finger at them. According to David Plotnik the "entire family witnessed [this gesture] probably 15 [to] 20 times." Meihaus testified he did not recall these incidents.

One day in July 2008, Joyce Plotnik and a friend took their children swimming at the community association's pool. Joyce Plotnik testified that as

she pulled into the parking lot, Meihaus arrived and entered the pool area. When the Plotniks' guests arrived the group entered the pool area together. Plaintiffs' witnesses testified they saw Meihaus, wearing street clothes and sunglasses, sitting by the pool. According to them, he stared in the direction of Joyce Plotnik for approximately 20 minutes before leaving the area. Joyce Plotnik testified she "thought [she] was going to get sick." Meihaus also denied any recollection of this incident.

Plaintiffs presented testimony concerning other instances when Joyce Plotnik encountered members of the Meihaus family. She testified that once while she and her son were walking their dog, Meihaus approached and said, " 'Don't let your dog piss on other people's lawns.' " Meihaus acknowledged this incident occurred.

On another occasion while Joyce Plotnik and a neighbor were walking to a nearby mountain ridge, members of the Meihaus family crossed in front of them going towards the same area. Joyce Plotnik and her companion decided to walk in another direction. In February 2010, Joyce Plotnik and Carol Gomez, a friend, were walking down a street when Meihaus drove past them. He stopped and began backing up the street toward his house. Gomez testified she told Joyce, " 'I think he's trying to intimidate you . . . .' " The two turned around and walked in the opposite direction. Meihaus denied any recollection of this incident.

In October 2008, upon returning from a vacation, plaintiffs discovered the portion of their side yard fence closest to the Meihauses' lot had been cut and two nearby trees had been damaged.

Things came to a head on April 9, 2009. David Plotnik testified that, around noon, he went to the backyard and began photographing yard clippings. Romeo, the family's 12- to 15-pound, 12-inch-tall miniature pinscher was with him. He denied Romeo was barking or growling. Plotnik heard loud banging against the opposite side of the rear fence. When he opened the gate, Romeo ran into the Meihauses' backyard. Losing sight of Romeo, Plotnik assumed the dog ran to the front of their residence. He returned to his lot and began walking along the adjacent public street. At that point, he heard Romeo barking and then squeal. He hurried home, arriving in time to see Romeo roll down the slope through the open gate and hit a tree.

Plotnik went through the gate and saw Meihaus holding a bat, returning to his house. He confronted Meihaus, yelling "Why did you hit our dog?" Plotnik testified Meihaus raised the bat to waist level, came within two feet of him, yelling, " 'You need to be more courteous and get your dogs to stop barking.' " Plotnik then accused Meihaus of damaging the side yard fence

and throwing debris over the rear fence, all of which Meihaus denied. Claiming Romeo was agitated and kept barking and growling at him, Meihaus testified he obtained a bat from the garage and used it to "guide" Romeo back to the Plotniks' yard. He denied striking the dog.

After this exchange, Plotnik returned to his residence to check on Romeo. The dog had difficulty walking. The family took him to a veterinarian. Eventually, Romeo needed surgery to repair his right rear leg. The surgery cost $2,600 and Joyce Plotnik paid another $209.53 for a stroller to help Romeo get around after the surgery. At trial, the veterinarian opined Romeo's leg injury resulted from a traumatic event.

Later the same afternoon, David Plotnik returned to the backyard and went to the opposite side of the rear fence and started photographing it. Defendants Greg Meihaus and John Meihaus III, both of whom were in their 20's, came out of the house and confronted him.

Plotnik testified John Meihaus III rushed to within two feet of him, put a camera in his face and said, " 'I'm going to take pictures of you.' " Greg Meihaus said, " 'How is your wife doing?,' " stood in front of Plotnik, called him names such as " 'punk ass bitch' " and " 'fatty,' " threatened " 'to kick [his] ass' " and " 'kill [him],' " and said " 'Why don't you suck my dick?' " John Meihaus III also said, " 'We are going to kill your dog.' " During the 10-minute confrontation Plotnik testified he became scared and began shaking. It ended when Joyce Plotnik appeared and told her husband to return home.

The Meihaus brothers acknowledged the confrontation occurred, but denied knowing Plotnik at the time and claimed they approached him because he was photographing their parents' house, not the fence. They also acknowledged arguing with Plotnik and making insulting statements, but claimed he did as well.

Plaintiffs filed this lawsuit. Meihaus responded with a cross-complaint for breach of contract against plaintiffs.

The parties submitted a 33-page verdict form to the jury that sought rulings on 32 issues. The first and second special verdicts concerned whether Meihaus breached the 2007 settlement agreements as to each plaintiff. The jury found he did and awarded emotional distress damages of $35,000 to David Plotnik and $70,000 to Joyce Plotnik.

Special verdicts 3, 4, and 5 involved David Plotnik's causes of action for assault against each defendant. The jury found Meihaus not liable on this

theory, but that each of the Meihaus brothers committed an assault. The jury awarded Plotnik damages of $10,000 against Greg Meihaus and $7,500 against John Meihaus III.

Four issues concerned Meihaus's injuring plaintiffs' dog. On special verdicts 6 and 7, for trespass to personal property, the jury found Meihaus intentionally harmed Romeo. It awarded David Plotnik damages of $2,600 for economic loss and $20,000 for emotional distress. In addition, the jury awarded Joyce Plotnik economic damages of $209.53 and emotional distress damages of $30,000. Special verdicts 20 and 21 concerned each plaintiff's cause of action against Meihaus for negligent interaction with the dog. The jury found in plaintiffs' favor and awarded emotional distress damages of $16,150 to David Plotnik and $30,000 to Joyce Plotnik.

In special verdicts 8 through 13, each plaintiff sought to recover for conversion from each defendant based on the damage to the side yard fence. The jury ruled for defendants, finding none of them intentionally damaged the fence. Special verdicts 28 through 30 dealt with David Plotnik's claims against each individual defendant for negligently cutting the fence. The jury found Meihaus alone liable and awarded economic damages of $350.

Each plaintiff sought recovery for intentional infliction of emotional distress from each defendant in special verdicts 14 through 19. The jury found neither Greg Meihaus nor John Meihaus III liable to Joyce Plotnik on this theory, but did award her $75,000 against Meihaus. As to David Plotnik the jury awarded him $50,000 against Meihaus and $1,000 each against Greg Meihaus and John Meihaus III.

Plaintiffs' cause of action for negligent infliction of emotional distress was covered by special verdicts 22 through 27. Again, the jury found Greg Meihaus and John Meihaus III not liable to Joyce Plotnik on these counts, but did award her $50,000 against Meihaus. The jury also awarded David Plotnik $30,000 against Meihaus and $1,000 each against Greg Meihaus and John Meihaus III.

Finally, special verdicts 31 and 32 concerned Meihaus's cross-complaint for breach of contract against the Plotniks. The jury found David Plotnik did not breach the 2007 settlement. While the jury found Joyce Plotnik did breach that agreement, it did not award Meihaus any damages.

The trial court entered judgment on the jury's special verdicts, awarding David Plotnik $154,100 against Meihaus, $12,000 against Greg Meihaus, and $9,500 against John Meihaus III for a total award of $175,600. The judgment awarded Joyce Plotnik $255,209.53 against Meihaus. The court also granted plaintiffs' motion for attorney fees on the breach of contract claim.

Defendants moved for a new trial, asserting the damage awards were excessive. The trial court conditionally granted the motion, but after plaintiffs accepted the remittitur, an amended judgment was entered reducing the overall awards by $30,000 as to David Plotnik and $50,000 as to Joyce Plotnik.

## DISCUSSION

### 1. *Introduction*

Defendants challenge the sufficiency of the evidence supporting plaintiffs' recovery on each successful theory alleged in their complaint except the economic damages awarded for Romeo's injury and the fence cutting. Alternatively, they contend the jury's damage awards need to be further reduced because they were duplicative. Finally, they attack the postjudgment orders on the new trial and attorney fee motions.

We begin by reviewing the applicable principles of appellate review. " 'It is well settled that all presumptions and intendments are in favor of supporting the judgment or order appealed from, and that an appellant has the burden of showing reversible error, and that, in the absence of such showing, the judgment or order appealed from will be affirmed. [Citations.]' [Citation.]" (*Walling v. Kimball* (1941) 17 Cal.2d 364, 373 [110 P.2d 58]; see *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 261 [92 Cal.Rptr.3d 862, 206 P.3d 403].)

On insufficiency of evidence claims, "[i]n reviewing the evidence . . . all conflicts must be resolved in favor of the respondent[s], and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. . . . [W]hen a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. [Citations.]" (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

### 2. *Breach of Contract*

Plaintiffs' first cause of action alleged Meihaus breached the 2007 settlement agreement's mutual restraint clause by engaging in conduct of "harass-[ing], vexing, and annoying . . . plaintiffs . . . and causing damage to [their] personal and real property . . . ." In response, Meihaus sued plaintiffs for breach of the settlement's mutual restraint clause. During cross-examination,

Joyce Plotnik acknowledged telling several friends about the lawsuit and that Meihaus hit Romeo with a baseball bat. The jury found Meihaus breached the settlement agreement and awarded damages to each plaintiff. Although it also found Joyce Plotnik breached the settlement agreement, no damages were awarded to Meihaus.

Meihaus argues the evidence fails to support a finding he breached the settlement agreement, the damages awarded to plaintiffs were excessive, and, in any event, Joyce Plotnik's breach of the same agreement precludes her recovery on the contract. These contentions lack merit.

The settlement's mutual restraint clause prohibited the parties from "harass[ing], vex[ing] or annoy[ing ]each other." It is true that some of the evidence plaintiffs presented about the parties' encounters would not support recovery of damages. Public interaction with people, even unfriendly neighbors, is a part of everyday life in an urban environment. Thus, testimony by Joyce Plotnik and her friends about passing Meihaus family members on public streets or seeing them driving through the neighborhood was irrelevant. The same is true for Meihaus's one-time comment to Joyce Plotnik to curb her dog's urination on neighbors' lawns.

However, other evidence does support the jury's breach of contract verdicts. Plaintiffs testified that shortly after entering into the settlement, they began to find yard clippings and debris on their property along the rear fence. David Plotnik described the clippings as similar to the foliage he saw in the Meihauses' yard. This conduct continued throughout the 18-month period between the fence settlement and the April 4, 2009 incidents. In addition, plaintiffs testified to Meihaus repeatedly making a vulgar gesture when they and their children passed him on the street. Viewing the evidence in the light most favorable to plaintiffs, as we are required to do, we also conclude the jury could find Meihaus engaged in further annoying behavior by intentionally staring at Joyce Plotnik for an extended time at the community pool. These actions supported the jury's conclusion Meihaus breached the settlement agreement.

█ We also reject Meihaus's attack on the damage awards for his breach of the settlement agreement. Civil Code section 3300 declares, "For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Generally, "damages for mental suffering and emotional distress are . . . not compensable in contract actions. [Citation.]" (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 516 [28 Cal.Rptr.2d 475, 869 P.2d 454].) But exceptions exist. One is where

" 'the breach is of such a kind that serious emotional disturbance was a particularly likely result.' [Citation.]" (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 558 [87 Cal.Rptr.2d 886, 981 P.2d 978].) "Thus, when the express object of the contract is the mental and emotional well-being of one of the contracting parties, the breach of the contract may give rise to damages for mental suffering or emotional distress. [Citations.]" (*Id.* at p. 559; see *Westervelt v. McCullough* (1924) 68 Cal.App. 198, 208–209 [228 P. 734].)

This case is a good example of where the exception applies. It involves a dispute between neighbors sharing a common boundary. The prior lawsuit arose after plaintiffs removed the original fence and built a larger one in its place. The settlement of that action contained a mutual restraint provision to protect against the kind of activity that subsequently occurred.

Of course, the amount of damages must be reasonable. (Civ. Code, § 3359.) But " ' "[t]here is no fixed or absolute standard by which to compute the monetary value of emotional distress," ' " and a " 'jury is entrusted with vast discretion in determining the amount of damages to be awarded . . . .' [Citation.]" (*Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 595 [36 Cal.Rptr.3d 154].) Consequently, as defendants acknowledge, " '[o]ur power over excessive damages exists only when the facts are such that the excess appears as a matter of law, or is such as to suggest at first blush, passion, prejudice, or corruption on the part of the jury. [Citations.]' " (*Rattray v. Albert* (1956) 146 Cal.App.2d 354, 356 [303 P.2d 799]; accord, *Hope v. California Youth Authority, supra,* 134 Cal.App.4th at p. 595.) Given the repeated and continuous nature of Meihaus's harassing, vexing, and annoying actions, we cannot conclude the jury's contractual damage awards are excessive as a matter of law.

■ Finally, Meihaus argues the contract damages awarded to Joyce Plotnik must be reversed because the jury found she also breached the settlement agreement's mutual restraint clause. "It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance. [Citation.]" (*Consolidated World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 380 [11 Cal.Rptr.2d 524].) Thus, "[o]ne who himself breaches a contract cannot recover for a subsequent breach by the other party." (*Silver v. Bank of America* (1941) 47 Cal.App.2d 639, 645 [118 P.2d 891].)

But "in contract law a material breach excuses further performance by the innocent party. [Citations.]" (*De Burgh v. De Burgh* (1952) 39 Cal.2d 858, 863 [250 P.2d 598]; see *Brown v. Grimes* (2011) 192 Cal.App.4th 265, 277 [120 Cal.Rptr.3d 893].) "Normally the question of whether a breach of an obligation is a material breach, so as to excuse performance by the other party, is a

question of fact. [Citations.]" (*Brown v. Grimes, supra,* 192 Cal.App.4th at pp. 277–278.) Viewing the evidence in the light most favorable to plaintiffs, Meihaus's repeated acts of harassment supported a finding he materially breached the settlement agreement, thereby excusing Joyce Plotnik's noncompliance with the mutual restraint clause's prohibition by making disparaging statements about him to others.

An analogous situation was presented in *Sanchez v. County of San Bernardino* (2009) 176 Cal.App.4th 516 [98 Cal.Rptr.3d 96]. The plaintiff, a county employee forced to resign because of a conflict of interest, entered into a confidential severance agreement with the county that prohibited either party from disclosing the reasons underlying her termination. County personnel violated the agreement's confidentiality clause. The plaintiff sued, but the trial court granted summary adjudication on the breach of contract claim. The Court of Appeal reversed. In part, the county sought to uphold the judgment on the ground the plaintiff waived the confidentiality clause by discussing the reasons for her resignation with her family and friends. In rejecting this argument the appellate court noted the plaintiff "made her disclosures only after she learned that the County itself had already violated the confidentiality provision. . . . A reasonable jury could conclude that the County's breach of the confidentiality provision excused any further performance by Sanchez. [Citation.]" (*Id.* at pp. 529–530.) A similar result applies here.

We conclude Meihaus's attacks on the portion of the judgment awarding damages for breach of the settlement agreement lack merit.

3. *The Assault Counts*

The complaint alleged two causes of action for assault on David Plotnik. One count alleged Meihaus assaulted him when he approached Plotnik carrying the bat. The jury found for Meihaus on this claim.

The second count alleged Greg Meihaus and John Meihaus III assaulted David Plotnik when they confronted him on April 9, 2009. On this count, the jury found for Plotnik, awarding him damages of $10,000 against Greg Meihaus and $7,500 against John Meihaus III.

The Meihaus brothers contend the evidence fails to support the latter verdicts because their encounter with Plotnik amounted to only a heated verbal argument. Plaintiffs respond the brothers' "physical movements," "coupled with threats to [Plotnik] and his family" sufficed to support the jury's verdict. We conclude the evidence falls short of that required for an assault.

██ " 'Generally speaking, an assault is a demonstration of an unlawful intent by one person to inflict immediate injury on the person of another then

present.' [Citation.]" (*Lowry v. Standard Oil Co.* (1944) 63 Cal.App.2d 1, 6–7 [146 P.2d 57].) In *Lowry*, the plaintiff was injured when he fled from a man who pointed what turned out to be an unloaded gun at him and pulled the trigger. In finding this conduct constituted an assault, the appellate court stated, "A civil action for assault is based upon an invasion of the right of a person to live without being put in fear of personal harm. Every person has 'the right of protection from bodily restraint or harm.' [Citation.] . . . The pointing of a gun at another in a threatening manner is sufficient to cause fear of personal injury unless it is known by the person at whom the weapon is pointed that the gun is in fact unloaded. [Citations.]" (*Id.* at p. 7; see *Thing v. La Chusa* (1989) 48 Cal.3d 644, 649 [257 Cal.Rptr. 865, 771 P.2d 814].)

The Meihaus brothers aggressively approached Plotnik and threatened to both beat and kill him and the family dog. But Plotnik did not testify that either brother displayed a weapon, took a swing at him, or otherwise attempted to touch him.

Penal Code section 240 defines the crime of assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." "In tort actions for assault . . . , the courts usually assume that th[is] Penal Code definition[] and related criminal cases are applicable. [Citations.]" (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 381, p. 598.) The Supreme Court has held proof of a criminal assault "requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams* (2001) 26 Cal.4th 779, 790 [111 Cal.Rptr.2d 114, 29 P.3d 197]; see *People v. Chance* (2008) 44 Cal.4th 1164, 1169 [81 Cal.Rptr.3d 723, 189 P.3d 971] [assault " 'established upon proof the defendant wilfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery' "].) Furthermore, Witkin notes the general rule that "while apprehension of that contact is the basis of assault [citation,] [m]ere words, however threatening, will not amount to an assault. [Citations.]" (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 383, pp. 599–600.)

The brothers' actions and words were aggressive and threatening, and while their behavior might support relief on some other ground, neither committed an act that could or was " 'inten[ded] . . . to inflict immediate injury on' " Plotnik. (*Lowry v. Standard Oil Co. of California, supra,* 63 Cal.App.2d at p. 6.) Therefore the portion of the judgment awarding David Plotnik damages against Greg Meihaus and John Meihaus III for assault must be reversed.

4. *The Attack on Romeo*

Plaintiffs sought damages from Meihaus on causes of action for trespass to personal property and negligence arising from his injuring Romeo by striking the dog with a bat. On the trespass count, the jury awarded plaintiffs both economic damages for Romeo's surgery and postoperative care, plus damages for the emotional distress each plaintiff suffered as a result of the incident. On the negligence count the jury awarded additional emotional distress damages to plaintiffs.

Meihaus first contends he is not liable because he lawfully exercised his right of self-defense in response to Romeo's threat to bite him. The issues of whether Meihaus truly felt threatened by plaintiffs' 15-pound, 12-inch-tall dog and actually struck Romeo with the bat presented factual questions for the jury to decide. (*Haeussler v. De Loretto* (1952) 109 Cal.App.2d 363, 364 [240 P.2d 654].) Contrary to Meihaus's assertion, the relevant facts were not uncontested. We must accept the jury's implied findings on these matters.

Alternatively, Meihaus argues plaintiffs cannot recover emotional distress damages for his injuring their dog. Insofar as he challenges plaintiffs' recovery on the negligence count, we agree this court's decision in *McMahon v. Craig* (2009) 176 Cal.App.4th 1502 [97 Cal.Rptr.3d 555] supports reversal. There we held a pet owner could not recover damages for emotional distress or loss of companionship based on a veterinarian's negligent treatment that resulted in a dog's death. (*Id.* at pp. 1506, 1509–1515.) "Regardless of how foreseeable a pet owner's emotional distress may be in losing a beloved animal, we discern no basis in policy or reason to impose a duty on a veterinarian to avoid causing emotional distress to the owner of the animal being treated . . . ." (*Id.* at p. 1514.) Thus, the damages awarded to each plaintiff on the negligence count must be reversed.

Meihaus does not dispute the amount of the expenses plaintiffs incurred for Romeo's surgery and care after being injured. Consequently, we affirm the jury's economic damage awards on the trespass cause of action.

■ The primary issue here is whether plaintiffs can recover under the trespass to personal property cause of action for the emotional distress they suffered resulting from Meihaus's injuring Romeo by striking him with a bat. Generally, "[f]or the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ. Code, § 3333.)

Citing *Zaslow v. Kroenert* (1946) 29 Cal.2d 541 [176 P.2d 1], *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342 [1 Cal.Rptr.3d 32, 71 P.3d 296], and

*McMahon v. Craig, supra,* 176 Cal.App.4th 1502, Meihaus argues "California [has] rejected the concept that an animal owner may recover emotional distress damages due to injuries his animal received at the hands of a[n-other] . . . ." We disagree.

■ "Under California law, trespass to chattels 'lies where an intentional interference with the possession of personal property *has proximately caused injury.*' [Citation.]" (*Intel Corp. v. Hamidi, supra,* 30 Cal.4th at pp. 1350–1351.) "Where the conduct complained of does not amount to a substantial interference with possession or the right thereto, but consists of intermeddling with or use of or damages to the personal property, the owner has a cause of action for trespass . . . ." (*Zaslow v. Kroenert, supra,* 29 Cal.2d at p. 551; see *Jamgotchian v. Slender* (2009) 170 Cal.App.4th 1384, 1400–1402 [89 Cal.Rptr.3d 122] [owner of horse injured in race could sue track steward for trespass when steward rejected request to scratch horse from race and prevented animal's removal from track grounds].)

■ Dogs are considered personal property. (*Johnson v. McConnell* (1889) 80 Cal. 545, 548–549 [22 P. 219]; Pen. Code, § 491; Civ. Code, § 3340.) Generally, trespass to personal property allows one to "recover only the actual damages suffered by reason of the impairment of the property or the loss of its use. [Citations.]" (*Zaslow v. Kroenert, supra,* 29 Cal.2d at p. 551.) In *Kimes v. Grosser* (2011) 195 Cal.App.4th 1556 [126 Cal.Rptr.3d 581], the court held a pet owner could recover "the [reasonable and necessary] costs of care of the pet attributable to the injury" caused by another. (*Id.* at p. 1558.)

■ But no case cited by Meihaus prohibits the recovery of damages for emotional distress. *McMahon* did not involve an action for trespass to personal property. In *Zaslow,* the plaintiff unsuccessfully sought the entire value of personal property a cotenant wrongfully removed from the premises and placed in storage even though the plaintiff was afforded an opportunity to recover possession of his effects. *Intel Corp. v. Hamidi, supra,* 30 Cal.4th 1342 involved a defendant using the plaintiff's internal e-mail system to send messages to its employees. The court merely held "the tort does not encompass, and should not be extended to encompass, an electronic communication that neither damages the recipient computer system nor impairs its functioning." (*Id.* at p. 1347.) And in *Kimes,* the court expressly noted the "[p]laintiff is not seeking damages for emotional distress." (*Kimes v. Grosser, supra,* 195 Cal.App.4th at p. 1558, fn. 1.) Since "the language used in any opinion is to be understood in the light of the facts and the issue then before the court[,] . . . cases are not authority for propositions not considered. [Citation.]" (*McDowell and Craig v. City of Santa Fe Springs* (1960) 54 Cal.2d 33, 38 [4 Cal.Rptr. 176, 351 P.2d 344], citation omitted.)

■ We believe good cause exists to allow the recovery of damages for emotional distress under the circumstances of this case. In the early case of *Johnson v. McConnell, supra,* 80 Cal. 545, the court noted "while it has been said that [dogs] have nearly always been held 'to be entitled to less regard and protection than more harmless domestic animals,' it is equally true that there are no other domestic animals to which the owner or his family can become more strongly attached, or the loss of which will be more keenly felt." (*Id.* at p. 549.) Additionally, one can be held liable for punitive damages if he or she willfully or through gross negligence wrongfully injures an animal. (Civ. Code, § 3340.) Intentionally maiming, mutilating, torturing, or wounding an animal also constitutes a crime. (Pen. Code, § 597, subd. (a).)

■ Trespass to personal property often arises in circumstances where a defendant's interference with another's property falls short of that required for a conversion cause of action. Thus, cases have described this tort as "the 'little brother of conversion.' " (*Intel Corp. v. Hamidi, supra,* 30 Cal.4th at p. 1350; see *Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1566–1567 [54 Cal.Rptr.2d 468].) In *Gonzales v. Personal Storage, Inc.* (1997) 56 Cal.App.4th 464 [65 Cal.Rptr.2d 473], the court recognized "the limits imposed with respect to recovery for emotional distress caused by a defendant's negligence do not apply when distress is the result of a defendant's commission of the distinct torts of trespass, nuisance or conversion" (*id.* at p. 475), and held "damages for emotional distress growing out of a defendant's conversion of personal property are recoverable" (*id.* at p. 477; see *Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 921 [114 Cal.Rptr. 622, 523 P.2d 662] ["compensation for pain, suffering, and emotional distress" allowed in action for breach of contract, fraud, and conversion resulting from loss and destruction of goods while in transit]). Cases involving actions for trespass to real property and nuisance have also recognized a party may recover emotional distress damages. (*Acadia, California, Ltd. v. Herbert* (1960) 54 Cal.2d 328, 337 [5 Cal.Rptr. 686, 353 P.2d 294] ["regardless of whether the occupant of land has sustained physical injury, he may recover damages for the discomfort and annoyance of himself and the members of his family and for mental suffering occasioned by fear for the safety of himself and his family when such discomfort or suffering has been proximately caused by a trespass or a nuisance"]; *Herzog v. Grosso* (1953) 41 Cal.2d 219, 225 [259 P.2d 429] ["Once a cause of action for trespass or nuisance is established, an occupant of land may recover damages for annoyance and discomfort that would naturally ensue therefrom."].)

Furthermore, cases in other states have recognized a pet owner may recover for mental suffering caused by another's wrongful acts resulting in the pet's injury or death. (*Womack v. Von Rardon* (2006) 133 Wn.App. 254, 263 [135 P.3d 542] [cat set on fire; "malicious injury to a pet can support a claim for, and be considered a factor in, measuring a person's emotional

distress damages"]; *La Porte v. Associated Independents, Inc.* (Fla. 1964) 163 So.2d 267, 269 [garbage collector hurled can at tethered dog, killing it; "the affection of a master for his dog is a very real thing and . . . the malicious destruction of the pet provides an element of damage for which the owner should recover, irrespective of the value of the animal . . ."]; *Brown v. Crocker* (La.Ct.App. 1962) 139 So.2d 779, 781–782 [affirming recovery of damages "for shock and mental anguish experienced" for "death of . . . mare" and "loss of [stillborn] colt" "as a result of . . . shooting"]; see Annot., Recovery of Damages for Emotional Distress Due to Treatment of Pets and Animals (2001) 91 A.L.R.5th 545.)

 Consequently, while we reverse the damages awarded plaintiffs on their negligence claim, we uphold both the economic and emotional distress damages plaintiffs recovered for trespass to personal property arising from Meihaus's act of intentionally striking Romeo with a bat.

### 5. *Negligent Infliction of Emotional Distress*

The complaint also contained a claim for negligent infliction of emotional distress against all three defendants. The jury's special verdicts found Meihaus liable on this theory as to both plaintiffs and awarded damages of $30,000 to David Plotnik and $50,000 to Joyce Plotnik. Greg Meihaus and John Meihaus III were also found to have negligently caused each plaintiff emotional distress, but the jury awarded only David Plotnik damages of $1,000 against each brother. Defendants contend the recovery on this count cannot stand. We agree.

 " '[The] *negligent* causing of emotional distress is not an independent tort but the tort of *negligence* . . . .' [Citation.] 'The traditional elements of duty, breach of duty, causation, and damages apply. [¶] Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and upon a weighing of policy considerations for and against imposition of liability.' [Citation.]" (*Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 588 [257 Cal.Rptr. 98, 770 P.2d 278].) To support relief the defendant must owe a duty to the plaintiff "that is 'assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two.' [Citation.]" (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1073 [9 Cal.Rptr.2d 615, 831 P.2d 1197].)

Nothing in the record supports a conclusion Greg Meihaus and John Meihaus III owed plaintiffs a duty to avoid negligently causing them emotional distress. Thus, the damages awarded to David Plotnik against Greg Meihaus and John Meihaus III on this theory must be reversed. As for

Meihaus, the only basis for finding a duty to plaintiffs was his contractual obligation "not to harass, vex or annoy" them. But we have already concluded plaintiffs are entitled to recover damages from Meihaus for his breach of this contractual duty. As discussed more fully below, allowing recovery against him for negligent infliction of emotional distress for breaching this duty would constitute overcompensation. (*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158–1159 [17 Cal.Rptr.2d 608, 847 P.2d 574]; *Shell v. Schmidt* (1954) 126 Cal.App.2d 279, 291 [272 P.2d 82].)

The damages awarded to plaintiffs for negligent infliction of emotional distress are not identical to the sums they recovered for breach of the settlement agreement. But the duty underlying each cause of action is identical and we see no basis for distinguishing between the emotional distress plaintiffs suffered because of Meihaus's breach of the settlement and his liability in tort for negligent infliction of emotional distress. Plaintiffs impliedly acknowledge this to be the case, arguing the trial court's remittitur "corresponds" to the sums awarded them on this cause of action. We conclude plaintiffs' recovery for negligent infliction of emotional distress must be reversed.

### 6. *Intentional Infliction of Emotional Distress*

#### a. *Introduction*

The complaint contained a cause of action for intentional infliction of emotional distress against all defendants. On this count the jury awarded David Plotnik $50,000 against Meihaus and $1,000 each against Greg Meihaus and John Meihaus III, and also awarded Joyce Plotnik $75,000 against Meihaus.

 "A cause of action for intentional infliction of emotional distress exists when there is ' " ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' " ' [Citations.]" (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050 [95 Cal.Rptr.3d 636, 209 P.3d 963].) Defendants contend the law and the evidence fail to support plaintiffs' recovery on this tort theory. We agree with them in part.

#### b. *The Claim Against Meihaus*

As for each plaintiff's recovery against Meihaus, we conclude that, in large part, the evidence fails to support a finding on the first element. "A

defendant's conduct is 'outrageous' when it is so ' " 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' " ' [Citation.] And the defendant's conduct must be ' " 'intended to inflict injury or engaged in with the realization that injury will result.' " ' [Citation.]" (*Hughes v. Pair, supra,* 46 Cal.4th at pp. 1050–1051.) But "[l]iability for intentional infliction of emotional distress ' "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." [Citation.]' [Citations.]" (*Id.* at p. 1051.)

Plaintiffs' appellate brief cites a series of facts they contend supports the jury's verdict in their favor on this theory. One claim is that they "experienced problems with Meihaus within the first month of moving in" to their home. But plaintiffs gave up any right to rely on that conduct in the 2007 settlement, which contained a mutual release of "any and all claims . . . or causes of action, known or unknown, . . . [they] now own or hold, or have heretofore owned . . . ." Plaintiffs also cite Joyce Plotnik's testimony that she wanted the settlement to contain a mutual restraint clause. They succeeded in attaining that objective and also recovering in contract for Meihaus's breach of it.

Next, plaintiffs rely on public encounters with Meihaus and other members of his family, plus Meihaus's comment to Joyce Plotnik about curbing her dog. As discussed above, these acts would not even support recovery under the settlement agreement's more lenient mutual restraint clause. " 'Liabilities of course cannot be extended to every trivial indignity. . . . [¶] Accordingly, it is generally held that there can be no recovery for mere profanity, obscenity, or abuse, without circumstances of aggravation, or for insults, indignities or threats which are considered to amount to nothing more than mere annoyances. The plaintiff cannot recover merely because of hurt feelings.' " (*Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116, 1128 [257 Cal.Rptr. 665].)

Plaintiffs also cite the damage to their side yard fence while they were away on vacation. The jury's findings concerning the fence cutting defeat reliance on this ground. The complaint contained two causes of action for damage to the fence, one seeking recovery for conversion and another based on negligence. In their special verdicts, the jury found for defendants on the conversion count, rejecting plaintiffs' assertion defendants "intentionally damage[d] the wooden fence." On the negligence count, the jury found Meihaus liable to David Plotnik, awarding $350 in economic damages. Because the jury imposed liability for the fence damage solely because Meihaus failed to exercise due care, that conduct cannot support a finding he acted in an outrageous manner.

Concerning David Plotnik's April 4 encounter with Meihaus, we note he, not Meihaus, precipitated the confrontation, accusing Meihaus of not only hitting Romeo, but also throwing trash over the fence and cutting the side yard fence. In response, Meihaus merely denied Plotnik's accusations and told him to take steps to limit Romeo's barking. "In evaluating whether the defendant's conduct was outrageous, . . . '. . . [l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' [Citation.]" (*Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 496 [76 Cal.Rptr.2d 540].) Even the jury agreed Meihaus's actions did not amount to an assault. This encounter does not rise to the level of what the law deems to be outrageous conduct.

■■■ Other acts cited by plaintiffs included Meihaus's rude and vulgar behavior that violated the settlement agreement's mutual restraint clause, i.e., the repeated dumping of debris over the rear fence, his prolonged staring at Joyce Plotnik on one occasion, and his repeated use of an offensive gesture when encountering members of the Plotnik family. Plaintiffs also point to Meihaus's injuring of Romeo in support of the intentional infliction of emotional distress claim. We have no doubt that in a proper case a person's intentional injuring or killing a pet will support recovery of damages for intentional infliction of emotional distress. Cases in other states have so held. (*Burgess v. Taylor* (Ky.Ct.App. 2001) 44 S.W.3d 806, 810–812 [horse owner entitled to recover for intentional infliction of emotional distress from boarder who sold horses to slaughterhouse]; *Richardson v. Fairbanks North Star Borough* (Alaska 1985) 705 P.2d 454, 456 [state supreme court "willing to recognize a cause of action for intentional infliction of emotional distress for the intentional or reckless killing of a pet animal"]; *Gill v. Brown* (Ct.App. 1985) 107 Idaho 1137, 1139 [695 P.2d 1276] [the plaintiffs entitled to recover for intentional infliction of emotional distress where the defendant shot and killed their pet donkey].)

In *McMahon v. Craig, supra*, 176 Cal.App.4th 1502, we rejected an attempt to allege intentional infliction of emotional distress against a veterinarian who tried to hide the fact her negligent treatment of the plaintiff's dog resulted in the animal's death. (*Id.* at pp. 1515–1517.) This case is distinguishable from *McMahon*. There the defendant had no intent to injure the plaintiff's dog, but rather intentionally tried to cover up her liability for the animal's death. Here, the evidence supported a conclusion Meihaus went to his garage, retrieved a bat, and used it to intentionally strike Romeo.

But even if the jury's intentional infliction of emotional distress award could be upheld, we conclude the verdicts must be reversed for a more basic

reason. As defendants note, the jury's special verdicts awarding plaintiffs emotional distress damages under several different theories constituted "duplicative damages for the same transactional event," thereby violating "[t]he rule against double recovery."

"The primary right theory . . . provides that a 'cause of action' is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the defendant, and a wrongful act by the defendant constituting a breach of that duty. [Citation.] The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action. [Citation.] . . . [¶] As far as its content is concerned, the primary right is simply the plaintiff's right to be free from the particular injury suffered. [Citation.] It must therefore be distinguished from the *legal theory* on which liability for that injury is premised: 'Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief.' [Citation.]" (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 681–682 [34 Cal.Rptr.2d 386, 881 P.2d 1083]; see *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 798 [108 Cal.Rptr.3d 806, 230 P.3d 342].)

Thus, where a party "ha[s] alleged the existence of but one primary right, and but one violation of that right," the "complaint states but one cause of action, even though two or more theories of recovery are alleged. [Citation.]" (*Shell v. Schmidt, supra*, 126 Cal.App.2d at p. 291.) "Regardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence. [Citation.] Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited. [Citation.]" (*Tavaglione v. Billings, supra*, 4 Cal.4th at pp. 1158–1159; accord, *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 702 [101 Cal.Rptr.3d 773, 219 P.3d 749].)

That is the case here. The special verdicts allowed recovery of emotional distress damages for Meihaus's injuring Romeo under theories of negligence and trespass to personal property, plus potentially as part of the damages awarded for both intentional and negligent infliction of emotional distress.

Plaintiffs note there is evidence the parties drafted the special verdicts with the intent of avoiding duplicative damage awards and that the jury intended its damage awards on each count to be separate and independent of the sums awarded on other counts. Even so, under the primary right doctrine this approach was erroneous. In *Shell v. Schmidt, supra*, 126 Cal.App.2d 279, 12 sets of plaintiffs sued for breach of contract and fraud arising from the defendant's failure to construct homes for them according to certain specifications. The jury received 13 verdict forms for the plaintiffs, 12 for each

couple on the fraud theory, and one for breach of contract as to all of them. The trial court instructed the jury that if it found for the plaintiffs on each theory, it could split the damage award between them. The Court of Appeal reversed the judgments for the plaintiffs, concluding the trial court gave "misleading instructions" that "resulted in verdicts and judgments that [were] highly inconsistent and contradictory." (*Id.* at pp. 292, 293.)

" '[A]n appellate court will interpret the verdict if it is possible to give a correct interpretation,' but will reverse if the verdict is 'hopelessly ambiguous.' [Citation.]" (*Roby v. McKesson Corp., supra*, 47 Cal.4th at p. 705.) It might be argued the disparity in the emotional distress damage awards on the various theories presented in this case renders the verdicts too indefinite to allow the judgment to stand. But we conclude this case need not be remanded for a new trial. As discussed above, plaintiffs' recovery of emotional distress damages on both their negligence and negligent infliction of emotional distress claims were legally erroneous. While Meihaus's vexatious conduct and his injuring of Romeo might entitle plaintiffs to recover for intentional infliction of emotional distress, we have already upheld plaintiffs' recovery on these grounds by affirming the contract and trespass to personal property verdicts. Allowing recovery for the same conduct here would amount to double recovery. Consequently, we reverse the damage awards both plaintiffs recovered against Meihaus for intentional infliction of emotional distress.

### c. *The Verdicts Against Greg Meihaus and John Meihaus III*

David Plotnik's recovery against Greg Meihaus and John Meihaus III for intentional infliction of emotional distress arose from the separate and subsequent incident where they aggressively rushed toward and confronted Plotnik while he was standing on his side of the property line photographing the fence. During this encounter the brothers made rude comments, expressly threatened both Plotnik and the family dog, plus made a veiled threat against Joyce Plotnik.

Defendants argue the brothers' actions did not rise to the level of outrageous conduct. We disagree. "Ordinarily mere insulting language, without more, does not constitute outrageous conduct." (*Kiseskey v. Carpenters' Trust for So. California* (1983) 144 Cal.App.3d 222, 230 [192 Cal.Rptr. 492].) But, it has long been recognized "a cause of action is established when it is shown that one, in the absence of any privilege, intentionally subjects another to the mental suffering incident to serious threats to his physical well-being, whether or not the threats are made under such circumstances as to constitute a technical assault." (*State Rubbish etc. Assn. v. Siliznoff* (1952) 38 Cal.2d 330, 336 [240 P.2d 282].) Under the circumstances of this case, the jury could reasonably conclude the Meihaus brothers' words and actions

combined "d[id] not constitute mere violations of the niceties of polite conversation," but rather "constitute[d] outrageous conduct intended to inflict emotional distress . . . ." (*Kiseskey v. Carpenters' Trust for So. California, supra*, 144 Cal.App.3d at p. 230.)

Defendants also claim the evidence fails to support a finding the brothers' conduct caused David Plotnik to suffer severe emotional distress. Again, we disagree.

 "Regarding emotional distress, the trial court initially determines whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. Where reasonable men can differ, the jury determines whether the conduct has been extreme and outrageous to result in liability. Otherwise stated, the court determines whether severe emotional distress can be found; the jury determines whether on the evidence it has, in fact, existed. [Citation.]" (*Godfrey v. Steinpress* (1982) 128 Cal.App.3d 154, 173 [180 Cal.Rptr. 95].)

Plotnik testified that, during his 10-minute encounter with the Meihaus brothers, he became frightened and began shaking, a reaction defendants noticed and used to their advantage. As stated in *Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78], "It is true that plaintiff's testimony did not indicate that he suffered any traumatic emotional distress of the character of shock, horror or nausea, but the requisite emotional distress may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry. [Citations.]" (*Id.* at p. 397.) In addition, " '[t]he intensity and duration of the distress are factors to be considered in determining its severity.' " (*Ibid.*) We conclude this evidence sufficed to support the jury's award of $1,000 in damages against each brother for intentionally causing Plotnik to suffer emotional distress.

## 7. The Postjudgment Orders

Claiming "the record is rife with duplicative damages for the same injuries," defendants argue the trial court erred in denying their motion for a new trial on the issue of damages. We generally review the ruling on a new trial motion for abuse of discretion. (*Dell'Oca v. Bank of New York Trust Co., N.A.* (2008) 159 Cal.App.4th 531, 547 [71 Cal.Rptr.3d 737].) But in light of our limiting plaintiffs' recovery to the damages awarded for breach of contract, trespass to personal property for injuring Romeo, negligence concerning the fence, and David Plotnik's emotional distress claim against Greg Meihaus and John Meihaus III, the concern over a duplicative damage award has been eliminated. Consequently, this renders moot the trial court's ruling on the new trial motion.

Meihaus attacks the trial court's order awarding plaintiffs $93,780 in legal expenses. The award was based on the settlement agreement's attorney fee clause. (Civ. Code, § 1717.) One argument asserted is that if "this [c]ourt finds no breach of contract, . . . then the . . . attorney[] fees cannot stand." Since we find plaintiffs are entitled to prevail on the contract claim, this argument fails.

Next, Meihaus argues we "must examine the express language" of the settlement agreement's attorney fee clause to determine whether it "includes tort claims." "Whether section 1717 applies is a legal question . . . rather than a factual question . . ." (*In re Tobacco Cases I* (2011) 193 Cal.App.4th 1591, 1602 [124 Cal.Rptr.3d 352]), which " 'we review de novo. [Citation.]' [Citation.]" (*Drybread v. Chipain Chiropractic Corp.* (2007) 151 Cal.App.4th 1063, 1069–1070 [60 Cal.Rptr.3d 580].) As discussed above given the nature of the parties' relationship, the language and scope of the settlement agreement's mutual restraint clause, the recovery awarded to plaintiffs was under the contract, not in tort. Thus, we reject this contention as well.

Meihaus also makes a conclusory argument that we "should remand for reconsideration of the amount [of attorney fees] awarded." Generally, "[t]he trial court has broad discretion to determine the amount of a reasonable fee, and . . . [w]e will reverse a fee award only if there has been a manifest abuse of discretion. [Citation.]" (*EnPalm, LCC v. Teitler* (2008) 162 Cal.App.4th 770, 774 [75 Cal.Rptr.3d 902], citation omitted.) But here, except for mentioning case law discussing the "[t]he 'degree of success' " factor, Meihaus provides no legal basis supporting a remand of the case on this ground. "[A]n appellate court [is not] required to consider alleged error where the appellant merely complains of it without pertinent argument. [Citation.] Since [defendant] does not address the issue, we treat it as abandoned . . . ." (*Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 710–711 [152 Cal.Rptr. 65].) Furthermore, it is clear from the appellate record plaintiffs were the successful party in the contract action.

We conclude defendants' attacks on the postjudgment rulings lack merit.

## DISPOSITION

The appeal from the original judgment is dismissed. The amended judgment is modified to award respondent David Plotnik damages of $57,950 against appellant John Meihaus, Jr., plus $1,000 each against appellant Greg Meihaus and appellant John Meihaus III, and to award respondent Joyce Plotnik damages of $100,209.53 against appellant John Meihaus, Jr. In

addition, respondents are awarded $93,780 in attorney fees against appellant John Meihaus, Jr., and trial court costs against all appellants. The parties shall bear their own attorney fees and costs on appeal.

Bedsworth, J., and Moore, J., concurred.

Appellants' petition for review by the Supreme Court was denied December 12, 2012, S205836.