Filed 3/16/21

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ARACELI CASTELLANO ZUNIGA, | F078402 & F078557 |
| Plaintiff and Respondent, | (Super. Ct. No. 15CECG02779) |
| v. | |
| CHERRY AVENUE AUCTION, INC., et al., | **OPINION** |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Fresno County. Donald S. Black, Judge.

Horvitz & Levy, David M. Axelrad, Stephen E. Norris, Yen-Shyang Tseng; Hollingshead & Associates, John W. Beebe; Law Office of Patrick J. Campbell and Patrick J. Campbell for Defendants and Appellants.

The Homampour Law Firm, Arash Homampour; The Ehrlich Law Firm and Jeffrey I. Ehrlich for Plaintiff and Respondent.

-ooOoo-

Defendants own and operate an outdoor swap meet in Fresno. In August 2013, plaintiff and her husband rented two vendor spaces at the meet. When they were setting

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III. and IV. of the Discussion.

up their booth in those spaces, a 28-foot metal pole holding their advertising banner touched an overhead power line. Plaintiff and her husband were electrocuted, and he died. A jury found defendants were 77.5 percent at fault and plaintiff's damages totaled $12.25 million. As a result, a judgment for approximately $9.5 million was entered against defendants.

On appeal, defendants contend they owed no duty of care to plaintiff because the danger presented by the overhead power line was open and obvious. We, like the trial court, conclude the evidence presented in this case did not establish as a matter of law that the danger was open and obvious. In particular, it was not obvious that the line was uninsulated, that it was energized, or that the amount of electricity being transmitted was lethal. Thus, a warning would not have been superfluous; it would have provided information that was not obvious.

Defendants also contend the *Privette* doctrine should be extended to and protect them from liability. (See *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*).) *Privette* established the general rule that the hirer of an independent contractor is not liable to the independent contractor's employees who sustain work-related injuries. The principal rationale for the *Privette* doctrine is that the hirer's liability should not be greater than the liability of a negligent independent contractor who is protected by workers' compensation insurance. Because no workers' compensation insurance covered the injuries to plaintiff and her husband, we conclude the *Privette* doctrine should not be extended to the landlord-tenant relationship that existed in this case.

The unpublished portions of this opinion address damages and costs. Based on our review of the special verdict form, the jury instructions, the jurors' question about damages, and closing arguments, we conclude the jury's award to plaintiff of past and future "Bystander Emotional Distress Damages" for being present and witnessing the death of her husband did not duplicate the award of emotional distress damages resulting from the electrocution of plaintiff herself. Accordingly, the damages awarded for those

2.

categories will be upheld. Also, plaintiff was the prevailing party and properly awarded her costs.

We therefore affirm the judgment.

## FACTS

Defendant Cherry Avenue Auction, Inc., a California corporation, has operated an outdoor swap meet on the same site in Fresno for over 40 years. Defendant W.D. & M.S. Mitchell Family Limited Partnership, an entity organized under Texas law, owns the land on which the swap meet operates. Defendant Kinsman Enterprises, LLC manages that property. In this opinion, we refer to these entities collectively as "Cherry Avenue." Two brothers, Neil and James Burson, own Cherry Avenue.

Cherry Avenue's swap meets are held on Tuesdays and Saturdays from 6:30 a.m. to 3:30 p.m. in an open-air market containing approximately 850 vendor spaces. Cherry Avenue rents the spaces to vendors, who can reserve them by the month or, based on availability, rent them by the day. The number of vendors on a particular day may reach 500 because some vendors occupy more than one space. The rent charged varies by location and ranges from $25 to $100 per space. Most vendors set up a frame holding a fabric canopy in the space they rent. Neil Burson estimated that about 30 percent of vendor booths have poles with upright advertising banners or flags attached.

Plaintiff Araceli Zuniga and her husband Jose Flores were married in Los Angeles in January 2009. That year, they began selling merchandise at swap meets in the Los Angeles area. They owned a booth with a frame made of metal tubing and a fabric canopy. The frame could be disassembled for transport and reassembled at the swap meet. They attached two 28-foot metal poles holding advertising banners to the booth's frame. The purpose of the banners was to attract customers.

In August 2013, Zuniga and her husband rented spaces 38 and 39 from Cherry Avenue. The previous times Zuniga and her husband had been at the swap meet, they have been located in a different area. Spaces 38 and 39 are among approximately 20

3.

vendor spaces located under a power line that was 26 feet and six inches above the ground. That power line was owned and maintained by Pacific Gas and Electric Company and had been installed in the 1930's.

When Zuniga and her husband arrived the morning of August 24, 2013, they assembled their booth on its side and attached the poles with the banners. When they tilted the booth upright, one of the 28-foot poles came in contact with the power line. Zuniga testified their practice was to lift the frame on a count of three and "when we counted to three, I felt like my whole body went cold." She stated: "When I woke up, I felt that my body was all cold, and I felt pain in my body. I could—I could smell a smell of something burnt. And the taste of metal that I could taste in my mouth." Zuniga saw her husband lying on the ground, ran to him and said: "Calm down. Everything is going to be all right. You need to be strong in order to get out of this. You can't—you can't leave me. I need you here with me. You are the only person that I have here." He moved his lips and died. The parties stipulated his cause of death was electrocution. He was 36 years old.

After the incident, Pacific Gas and Electric Company sent a compliance supervisor to inspect the power lines. His inspection did not identify anything that needed attention.

Zuniga and her husband had used their booth and 28-foot advertising banners at Cherry Avenue's swap meet approximately eight times before the incident. Zuniga produced a Cherry Avenue "Sellers Permit" for swap meets held on June 25th, July 16th and July 23rd of 2013. The preprinted seller permits set forth certain seller responsibilities, nine rules and regulations, and a notice about the consequences of selling counterfeit or illegal goods. The preprinted permits contain blank lines for the row and space being rented and a line for the initials of the person issuing the permit. Permits must be kept by sellers at the space rented at all times and sellers without a permit at the time of space verification are required to obtain one by paying the regular fee. The

permits do not contain a warning about the power lines and place no restrictions on advertising banners.

James Burson, an owner of Cherry Avenue, testified that, before the incident, he knew the power lines were dangerous, uninsulated and deadly. When asked if it occurred to him before the incident that people had flags underneath the power lines and might be electrocuted, he answered: "It didn't occur to me, because nothing was ever near those lines, no. So, it didn't occur to me." Neil Burson, the other owner, testified he did not know what voltage the power lines carried and he "wouldn't know the difference in insulated or uninsulated high voltage. They all look the same to me." When asked if he knew that someone putting a 28-foot pole by the power lines could be electrocuted and die, Neil Burson answered: "I've always known that they're not to be gotten near. So, I never considered somebody might throw a kite up there, because I know you stay away from them." During cross-examination, Zuniga's attorney mentioned the idea that the power line was obviously dangerous and said, "it wasn't obviously dangerous to you, and you're the one that owns this business, correct?" Neil Burson answered, "Correct."

Zuniga testified that, on the day of the incident, she did not notice the lines overhead. She also testified she knew overhead electrical lines could be dangerous if you touched them. Zuniga's safety expert, Brad Avrit, testified that if someone goes to spaces 38 and 39 and looks up, they will see the power lines and there was nothing directly overhead to obscure the view of the lines. When asked if it is common knowledge that electrical power lines are dangerous, he answered: "As a broad generality, yes." Avrit also was asked: "Does the average person need to know that an overhead power line is energized in order to deduce whether or not it's dangerous?" He responded: "The average person needs to be reminded of that, particularly if they're working at ground level and you have power lines that are up above." Avrit also testified he did not find any fault with Zuniga and her husband under the reasonably prudent person standard, stating:

"I think they acted as you would expect somebody that's erected this booth many times before, never had an issue with it, and—and in this case, they are concentrated on assembling it, they're down at ground level, and going to tilt it up. I don't find what they did unreasonable under the circumstances. They were -- they were being human. They had noticed other people have big flags, they put up a big flag. That's—that's reasonable and normal behavior."

Avrit also described the "HIGH VOLTAGE" sign that he observed near the top of the pole supporting the power lines, stating the letters were approximately three inches tall. A photograph of the sign was introduced into evidence.

## PROCEEDINGS

In August 2014, Zuniga filed a complaint for negligence against Cherry Avenue. On August 22, 2018, prior to voir dire of prospective jurors, the panel heard counsel for each side provide a brief overview of the lawsuit. They also heard the trial court read the parties' stipulation of facts and a first set of jury instructions.

Those jury instructions followed the Judicial Council of California Civil Jury Instructions (CACI) addressing premises liability. After using CACI No. 1000 to define the essential elements of a premises liability claim, the court addressed Cherry Avenue's basic duty of care as the landowner by stating:

> "A person who owns, leases, or controls property is negligent if he or she fails to use reasonable care to keep the property in a reasonably safe condition. A person who owns, leases, or controls property must use reasonable care to discover any unsafe conditions and to repair, replace, or give adequate warning of anything that could reasonably expect it to harm others.

> "In deciding whether Cherry Avenue Auction used reasonable care, you may consider, among other factors, the following: The location of the property; the likelihood that someone would come on the property in the same manner as Araceli Zuniga did; the likelihood of harm; the probable seriousness of such harm; whether Cherry Avenue Auction knew or should have known of the condition that created the risk of harm; the difficulty of protecting against the risk of such harm; and the extent of Cherry Avenue Auction's control over the condition that created the risk of harm." (See CACI No. 1001, Basic Duty of Care.)

6.

Next, based on CACI Nos. 1003 and 1004, the court instructed the panel on unsafe conditions and obviously unsafe conditions by stating:

> "Cherry Avenue Auction was negligent in the use or maintenance of the property if, one, a condition on the property created an unreasonable risk of harm; two, Cherry Avenue Auction knew or through the exercise of reasonable care should have known about it; and, three, Cherry Avenue Auction failed to repair the condition, protect against harm from the condition, or give adequate warning of the condition.

> "If an unsafe condition of the property is so obvious that a person could reasonably [be] expected to observe it, then the owner does not have to warn others about the dangerous condition; however, the owner still must use reasonable care to protect against the risk of harm if it is foreseeable that the condition may cause injury to someone who, because of necessity, encounters the condition."

On August 23, 2018, a jury was empaneled, counsel made opening statements, and the presentation of witnesses began. On August 29, 2018, the last witness testified, and counsel presented their closing arguments. The arguments addressing damages are discussed in part III.B.3. of this opinion. The next day, the trial court gave the jury its final instructions. On the duty of care, a central issue in this appeal, the jury was instructed:

> "A person who owns, leases, or controls property is negligent if he or she fails to use reasonable care to keep the property in a reasonably safe condition. A person who owns, leases, or controls property must use reasonable care to discover any unsafe conditions and to repair, replace, or give adequate warning of anything that could reasonably be expected to harm others."

After informing the jury of the factors to consider in determining whether Cherry Avenue used reasonable care, the trial court stated:

> "The Defendants were negligent in the use or maintenance of the property if, one, a condition on the property created an unreasonable risk of harm; two, the Defendants knew or through the exercise of reasonable care should have known about it; and three, the Defendants failed to repair the condition, protect against harm from the condition, or give adequate warning of the condition.

7.

"If an unsafe condition of the property is so obvious that a person could reasonably be expected to observe it, then the owner, lessor, or person who controls the property does not have to warn others about the dangerous condition."[1]

In addition, the trial court told the jury: "Landowners are required to maintain land in their possession and control in a reasonably safe condition, and this duty is non-delegable." The court informed the jury of Cherry Avenue's claim that the negligence of Zuniga and her husband contributed to the harm and that, if the jury found one or both negligent, the jury would have to determine the percentage of their responsibility.

On September 4, 2018, the jury reached its verdict. The jury found Cherry Avenue, Zuniga, and her husband were negligent and held Cherry Avenue 77.5 percent responsible, Zuniga 11.25 percent responsible and her husband 11.25 percent responsible. The jury found the damages totaled $12.25 million. The special verdict form is described in more detail in the unpublished portion part III.B.1. of this opinion.

Based on the jury's findings that Cherry Avenue was 77.5 percent responsible and damages totaled $12.25 million, the trial court entered judgment for plaintiff in the amount of $9,493,750 on September 6, 2018. The court also awarded prejudgment interest of $470,785.96 pursuant to Code of Civil Procedure section 998 and Civil Code section 3291.

Cherry Avenue filed a notice of intent to move for new trial and a notice of motion for judgment notwithstanding the verdict. In November 2018, the court denied both motions. Later in November, Cherry Avenue filed a notice of appeal challenging the judgment and the order denying its motion for judgment notwithstanding the verdict. The appeal was assigned case No. F078402.

---

[1] This sentence is the first sentence of CACI No. 1004. The second sentence of CACI No. 1004, which was added by a May 2018 revision and read to the prospective jurors at the start of the case, was not included.

Cherry Avenue also filed a motion to tax costs claimed by Zuniga in her memorandum of costs. In December 2018, the trial court granted the motion in part, taxing $2,055.25 of the costs claimed, while rejecting most of Cherry Avenue's challenges. Cherry Avenue also filed a notice of appeal challenging the order regarding costs. That appeal was assigned case No. F078557. In January 2021, this court ordered the two appeals consolidated.

## DISCUSSION

Cherry Avenue contends the judgment and award of costs should be reversed and a judgment entered in its favor because it owed no duty to Zuniga and her husband. First, Cherry Avenue argues the *Privette* doctrine, as extended by *Laico v. Chevron U.S.A., Inc.* (2004) 123 Cal.App.4th 649 (*Laico*), means a commercial lessor delegates to its tenants the responsibility of ensuring they safely perform their work on the leased property. Second, Cherry Avenue contends it owed no duty to warn about or remedy the power lines' dangers because those dangers were open and obvious. We reject both arguments.

## I.     *PRIVETTE* DOCTRINE

### A.     Overview

In *Privette*, *supra*, 5 Cal.4th 689, our Supreme Court adopted a principle of nonliability, holding that a person who hires an independent contractor to do dangerous work is not liable when an employee of the independent contractor suffers a work-related injury. (*Id*. at p. 692.) In other words, "[g]enerally, when employees of independent contractors are injured in the workplace, they cannot sue the party that hired the contractor to do the work." (*SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590, 594 (*SeaBright*).)

This specific rule of nonliability was adopted for two reasons. First, workers' compensation insurance usually provides the exclusive remedy for employees who are injured on the job. As a result, allowing the employee to recover from the contractor's

9.

hirer, who did not cause the injury, would unfairly subject the hirer to greater liability than that faced by the contractor whose negligence caused the injury. (*Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, 204 (*Hooker*).) Second, "[b]y hiring an independent contractor, the hirer implicitly delegates to the contractor any tort law duty it owes to the contractor's employees to ensure the safety of the specific workplace that is the subject of the contract." (*SeaBright*, *supra*, 52 Cal.4th at p. 594, italics omitted.) Such delegation includes any "duty the hirer owes to the contractor's employees to comply with applicable statutory or regulatory safety requirements," such as those mandated by Cal-OSHA. (*Ibid.*)

In light of Cherry Avenue's arguments about the scope of the *Privette* doctrine, we briefly describe Supreme Court decisions extending the doctrine. First, hirers are protected "from liability to the independent contractor's employee even when the basis for liability was that the hirer failed to provide in the contract that the contractor must take special precautions to avert the risks of the work. (*Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253, 256–257." (*Johnson*, *supra*, 33 Cal.App.5th at p. 628.) Second, *Privette* applies when the employee's theory of liability is that the hirer negligently hired the independent contractor. (*Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235, 1238; see *Johnson*, *supra*, at p. 628.) Third, "*Privette* applies when the injured employee's cause of action against the hirer of the independent contractor is based on the hirer's failure to comply with statutory or regulatory workplace safety requirements." (*Johnson*, *supra*, at p. 628, citing *SeaBright*, *supra*, 52 Cal.4th at p. 594.)

B.    Scope of *Privette* Doctrine

Based on *Privette* and subsequent Supreme Court decisions, we conclude the *Privette* doctrine applies to situations where there is a hirer (often a landowner), an independent contractor hired to perform a task, and an employee of the independent contractor who was injured on the jobsite. Here, Cherry Avenue formed a commercial

10.

landlord-tenant relationship with Zuniga and her husband when Cherry Avenue rented them spaces at the swap meet. There was no hiring of an independent contractor and there was no injury to an employee who was covered by workers' compensation insurance. Therefore, based on the plain language of our Supreme Court's decisions, we conclude the *Privette* doctrine does not apply to the landlord-tenant relationship between Cherry Avenue and Zuniga.

> C.  Extending the *Privette* Doctrine

Next, we consider Cherry Avenue's argument that *Laico* extended the *Privette* doctrine beyond situations where a landowner hired an independent contractor. We reject this argument because it misreads *Laico*. Furthermore, regardless of *Laico*, we conclude it is not appropriate for this court to extend the *Privette* doctrine to the relationship created by Cherry Avenue and Zuniga and her husband.

In *Laico*, the Sixth District's discussion plainly shows it was not applying the *Privette* doctrine to conclude the landowner owed no duty to Laico. First, the court stated it found "sufficient similarity in the plaintiffs' theory of the case that *Privette*, *Toland*, and *Hooker* provide *a useful analogy* to the issues presented here." (*Laico*, *supra*, 123 Cal.App.4th at p. 668, italics added.) This reference to *Privette* and other cases providing a useful analogy cannot be reasonably interpreted to mean the Sixth District applied the *Privette* doctrine to the landowner in that case.

Second, the Sixth District identified the legal principles it was applying by referring to (1) Civil Code section 1714 as the source of a property owner's general duty of care towards others and (2) the analysis set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108 for creating exceptions to the statutory duty to use ordinary care in the management of one's property. (*Laico*, *supra*, 123 Cal.App.4th at pp. 659–666.) In short, the court was applying rules of law governing premises liability and was not applying the *Privette* doctrine. The rules are readily apparent in the court's summary of

11.

its decision, which stated: "[W]e cannot find a basis for finding premises liability on the facts of this case. Plaintiffs have not shown the existence of a dangerous condition of land owned by [Chevron U.S.A.] or under its control; instead, the danger consisted of hazardous conduct by the occupant of that land through its employees. Plaintiffs further failed to establish [Chevron U.S.A.'s] knowledge of the danger, the right to inspect, or the ability to discover and remedy hazards of the workplace. [Chevron U.S.A.'s] duty of care as a landowner did not encompass a duty to oversee the testing performed by the premises occupant, [Laico's employer]." (*Id*. at p. 670.)

In closing our discussion of the *Privette* doctrine, we conclude it is not appropriate to extend that doctrine to landlord-tenant relationships. Doing so would overturn established rules of premises liability that govern a land possessor's duty to third parties when a dangerous condition exists on the property. Such a fundamental shift in the law is best done by the Legislature or our Supreme Court. Accordingly, we next consider how the rules of premises liability apply to the facts of this case.

II.   PREMISES LIABILITY

A.   The Duty of Care and Exceptions

In 1968, the California Supreme Court discarded the common law approach and determined that premises liability should be handled under ordinary negligence principles. (*Rowland*, *supra*, 69 Cal.2d at p. 119; see Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2020) ¶ 6:10, p. 6-9; 12 Witkin, Summary of Cal. Law (11th ed. 2017), Real Property, § 665, p. 752 [liability under foreseeability test].) The court identified the source of the landowner's duty by referring to Civil Code section 1714, the current version of which provides: "(a) Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of *ordinary care* or skill *in the management of his or her property* or person, except so far as the latter has, willfully or by want of ordinary care, brought the

12.

injury upon himself or herself." (Italics added.) The court stated that, under Civil Code section 1714, the test for liability applicable to the possessor of land "is whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others." (*Rowland*, *supra*, at p. 119.) Thus, pursuant to the general rule in Civil Code section 1714, a landlord owes a duty to its tenants to exercise ordinary care.

The general duty to exercise ordinary care in one's activities is subject to judicially created exceptions. Courts, however, create exceptions only where clearly supported by public policy. (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1143.) The most important public policy "factors are 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Ibid.*, citing *Rowland*, *supra*, 69 Cal.2d at p. 113.)

Here, the parties agree that, in certain circumstances, a landlord has no duty to remedy or warn of a dangerous condition that is open and obvious. The scope of the no-duty rule for open and obvious dangers, however, is disputed.[2] That dispute raises a question of law that does not need to be decided to resolve this appeal. Instead, we

---

[2] Cherry Avenue argues the only exception to the no-duty principle for open and obvious dangers is narrow and arises where the *practical necessity* of encountering the danger, when weighed against the apparent risk involved, is such that under the circumstances, a person might choose to encounter the danger. (*Kinsman*, *supra*, 37 Cal.4th at p. 673.) Zuniga argues the exception is broader and cites *Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, which states that "a possessor of land may, under certain circumstances, be liable for injuries caused by a *failure to remedy* an obvious or observable danger *if 'harm was foreseeable despite the obvious nature of the danger*.' " (*Id*. at p. 121, fn. 12.) *Osborn* refers to necessity as *an example* of circumstances where it is foreseeable that an open and obvious danger may cause injury. (*Id*. at p. 122.)

13.

assume Cherry Avenue's argument about the exception's scope is correct and address the question of whether the overhead power lines were an open and obvious danger.

### B.    Open and Obvious Danger

#### 1.    Overview

Stated in general terms, the no-duty exception for open and obvious dangerous conditions provides that " 'if a danger is so obvious that a person could reasonably be expected to see it, the condition itself serves as a warning, and the landowner is under no further duty to remedy or warn of the condition.' " (*Jacobs v. Coldwell Banker Residential Brokerage Co.* (2017) 14 Cal.App.5th 438, 447.)  Thus, the rationale for the exception to the general duty of ordinary care is that the foreseeability of harm usually is absent because third parties will perceive the obvious and take action to avoid the danger. (*Ibid.*)

Immediately prior to its deliberations, the jury was instructed on open and obvious dangerous conditions using the version of CACI No. 1004, Obviously Unsafe Conditions, that was in effect prior to its revision in May 2018.  The court told the jury:  "If an unsafe condition of the property is so obvious that a person could reasonably be expected to observe it, then the owner, lessor, or person who controls the property does not have to warn others about the dangerous condition."

#### 2.    Contentions and Trial Court's Determinations

Cherry Avenue's motion for judgment notwithstanding the verdict argued (1) whether it owed any duty to Zuniga was a question of law for the court and (2) it owed no duty to warn or remedy the open and obvious power lines that Zuniga and her husband did not need to encounter.  Cherry Avenue asserted the evidence showed the power lines had been in place for over 80 years, the lines were readily visible and discernible from the ground below, and there were no impediments such as trees or buildings to obscure the view of the lines.

14.

The trial court's order denying the motion for judgment notwithstanding the verdict stated Cherry Avenue's argument that it had no duty to warn or remedy the hazard created by the power lines hinged on Cherry Avenue's claims that the power lines were open and obvious and, thus, foreseeability of injury was absent. The court rejected this argument, stating: "The problem with this position is that the premise is faulty, i.e., there was abundant evidence the danger posed by the power lines is not open and obvious." The court also stated: "[T]here was abundant evidence that [Cherry Avenue] created the dangerous condition by establishing vendor spaces under the power lines all the while knowing that people would set up booths under the power lines and raise banners to draw attention to their booths." In addition, the court found it "foreseeable that persons would not see, or more likely, appreciate the danger posed by [the] high voltage power lines. There was abundant evidence to this effect during the trial."

### 3. Evidence About the Danger

Avrit, Zuniga's safety expert, testified that Cherry Avenue created a hazard for its vendors by creating vendor spaces directly below the power lines and then renting those spaces to vendors. Avrit testified "that studies show that people do not clearly recognize the difference between insulated and uninsulated lines" and, therefore, "most people aren't going to know … whether or not the lines that they may be looking at have or do not have insulation on them and can protect them from electrical shock." Avrit also testified most people have little or no understanding of the amount of electricity flowing through the lines and, because lines usually are silent,[3] they cannot tell by looking at them whether the lines are active or inactive. In addition, Avrit testified that most people do not understand that electricity can arc to a metal object even if the object does not come into contact with the line and, furthermore, they would not be able to tell what a

---

[3] Avrit stated that, on a clear day, there is no noise or sound caused by the power running through the line and that on a foggy day the lines will "crackle a little bit."

15.

safe distance is by looking at the line. The distance depends on the amount of voltage, and the higher the voltage, the greater the distance for a potential arc. Avrit also testified that some people might look at the poles used for the line and think of them as telephone poles, which might make them uncertain whether the lines were power lines or telephone lines.

Cherry Avenue's safety expert John Tyson was asked during cross-examination: "And it is very common for the public not to know power lines are energized and uninsulated, correct?" Tyson answered, "Well, I think so, yes. I can't give you any numbers though."

Cherry Avenue's expert Ralph Crawford, a forensic electrical engineer, was asked during cross-examination: "The fact is that you agree energized lines can cause electric shock or electrocution, which is death, and is not obvious to the average person, correct?" Crawford responded, "To the extent that I know anything about the average person, I would agree that could be the case." Similarly, during a videotaped deposition that was presented to the jury, Crawford answered "Yes" when asked: "The fact that these energized lines could cause electrical shock or electrocution is not obvious to your average person? [¶] Do you agree?" As described earlier, Neil Burson testified the power line was not obviously dangerous to him.

The foregoing testimony adequately supports the trial court's determination that the evidence presented was adequate to show "the danger posed by the power lines is not open and obvious." As a result, we cannot determine as a matter of law that the power line was an open and obvious danger. (See *Stark v. Lehigh Foundries, Inc.* (1957) 388 Pa. 1, 8 [" 'presence of the power lines in and of itself did not indicate obvious danger' "].)[4]

---

[4]    Cherry Avenue's opening brief contains a footnote stating courts in Pennsylvania along with Alabama, Arizona, Georgia and Kansas hold the dangers of visible power lines are not open and obvious and another footnote citing cases from 19 state courts that

16.

The finding that the danger was not open and obvious can be restated in terms of whether a warning to Zuniga and her husband would have been superfluous. A warning that the overhead lines were uninsulated and energized with enough electricity to cause death would have provided useful information to Zuniga and her husband—information that was not available simply by looking at the power lines. Thus, the warning would not have been superfluous. (Rest.3d Torts, *supra*, § 51, com. *k*, p. 252 ["Risks that are known, open, or obvious already provide notice to those who might be exposed to the risk, making a warning superfluous"].)

### 4. Contributory Negligence

Prior to our Supreme Court's adoption of principles of comparative fault in *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, a plaintiff's contributory negligence barred recovery against a defendant whose negligent conduct would otherwise have made the defendant liable to the plaintiff for the harm sustained. (*Id.* at pp. 809–810.) The application of California's now-abandoned doctrine of contributory negligence to power lines was described in *Mark v. Pacific Gas & Electric Co.* (1972) 7 Cal.3d 170:

> "[O]ur courts have often held that one who knowingly touches a high voltage power line or wire may be held contributorily negligent as a matter of law, since the danger of electrical shock from such high voltage lines is 'presumed to be familiar to men of average intelligence.' (*Andrews v. Valley Ice Co.*, 167 Cal. 11, 20 [138 P. 699] [power lines: decedent was a construction worker who 'must have known the danger of getting near highly charged wires']; see *Shade v. Bay Counties Power Co.*, 152 Cal. 10, 12 [92 P. 62] [hanging power lines: decedent was warned not to touch lines and "knew the danger of live wires"]; cf. *Mosley v. Arden Farms Co.*, 26 Cal.2d 213, 217 [157 P.2d 372, 158 A.L.R. 872] [all men are charged with knowledge of 'the qualities, characteristics, and capacities of things and forces in so far as they are matters of common knowledge at the time and in the community ...']; Rest.2d Torts, *supra*, § 290, and illus. 1 [one who grabs high voltage power line is negligent notwithstanding ignorance of

---

Cherry Avenue contends recognize the open and obvious nature of the danger created by power lines.

danger if danger is matter of common knowledge in community].)" (*Mark v. Pacific Gas & Electric Co.*, *supra*, 7 Cal.3d at pp. 180–181.)

This application of the doctrine of contributory negligence is similar in effect to a rule of law stating possessors of land have *no duty of care* to protect third parties from injuries caused by power lines. In this appeal, we will not interpret cases decided before *Li v. Yellow Cab* in 1975 as supporting a blanket rule of law that power lines are always an open and obvious danger for which landlords never have a duty of care. In other words, we decline to resurrect the doctrine of contributory negligence by recasting it as the absence of a duty of care.

Thirty years ago, the Illinois's Supreme Court commented on "[t]he manifest trend of the courts in this country … away from the traditional rule absolving, ipso facto, owners and occupiers of land from liability for injuries resulting from known or obvious conditions, and toward the standard expressed in section 343A(1) of the Restatement (Second) of Torts (1965)." (*Ward v. K Mart Corp.* (Ill. 1990) 554 N.E.2d 223, 231.) Cherry Avenue's argument for a blanket rule of law that the danger created by power line imposes no duty on landlords is contrary to this nation-wide trend as well as the approach California courts have taken to open and obvious dangers. (See *Martinez v. Chippewa Enterprises, Inc.* (2004) 121 Cal.App.4th 1179, 1184; Rest.3d Torts, *supra,* § 51 [general duty of land possessors].)

III.    DAMAGES*

A.    Contentions

Cherry Avenue contends the award of bystander emotional distress damages should be reversed on two independent grounds. First, Cherry Avenue argues the direct injury emotional distress damages award already includes bystander emotional distress damages. Second, Cherry Avenues asserts that Zuniga had no contemporaneous awareness of the electrocution or that it caused her husband's injury.

---

\*      See footnote, *ante*, page 1.

18.

Zuniga responds by contending there was no duplicative recovery because the jury's award of damages for direct injury emotional distress explicitly did not include damages for bystander emotional distress. Zuniga also contends substantial evidence supports the award of bystander emotional distress damages and Cherry Avenue cannot show any prejudice because Zuniga was entitled to recover all the emotional distress damages awarded as a direct victim.

B.      Background

        1.      *The Special Verdict Form*

The first question in the special verdict form asked if Cherry Avenue was negligent in the maintenance or use of the property. The second question asked if Cherry Avenue's negligence was a substantial factor in causing harm to plaintiff. In a nine-to-three vote, the jury answered "Yes" to both questions.

The special verdict form's question No. 3 stated: "What are the wrongful death damages for Araceli Zuniga's loss of Jose Flores' love, companionship, comfort, care, assistance, protection, affection society, moral support, and loss of training and guidance." In a ten-to-two vote, the jury found "[p]ast wrongful death damages" were $1 million and "[f]uture wrongful death damages" were $2.25 million.

The special verdict form's question No. 4 stated: "What are the emotional distress damages of Araceli Zuniga? Do not reduce the damages based on the fault, if any, of others." Immediately after the question, the special verdict form broke these damages down into four separate categories. The categories drew distinctions between (1) past and future distress and (2) direct and bystander emotional distress. The jury unanimously found (1) "Past Direct Injury Emotional Distress Damages" of $1 million; (2) "Future Direct Injury Emotional Distress Damages" of $2 million; (3) "Past Bystander Emotional Distress Damages" of $2 million; and (4) "Future Bystander Emotional Distress Damages" of $4 million.

19.

The damages found totaled $12.25 million.  Based on the jury's finding that Cherry Avenue was 77.5 percent responsible, the judgment held Cherry Avenue liable for $9,493,750 in damages.

### 2.  *Jury Instructions*

Ordinarily, one would expect an appellant to quote, or at least summarize, the jury instructions defining the categories of damages the appellant claims are duplicative.  In theory, the instructions would have informed the jury of the difference between direct emotional distress and bystander emotional distress and, if needed, the distinction between past and future damages.  Also, one might expect an appellant to refer to the arguments in counsels' closing statements about applying the categories of damages set forth in the special verdict form.  In this appeal, however, Cherry Avenue's briefing has not mentioned the instructions or counsels' closing statements.

Cherry Avenue's decision not to describe the jury instructions implies it regards the instructions as immaterial to its claim of reversible error.  Despite Cherry Avenue's implied position, we view the instructions as useful in determining whether the damages labeled "direct" and the damages labeled "bystander" were, in fact, duplicative.

First, to provide a complete picture of the four categories of damages, we address the past-future distinction.  Our independent review of the jury instructions located no explicit explanation of the difference between past and future damages.  This absence suggests the parties and the trial court regarded the terms "past" and "future" as clear in meaning and determined the jury could apply those terms as a matter of common sense.  The jury instructions did address one distinct requirement for awarding future damages, stating at least three times that Zuniga "must prove that she is reasonably certain to suffer that harm."  (See CACI Nos. 3905A [physical pain, mental suffering, and emotional distress], 3920 [loss of consortium].)

20.

Second, we consider the instructions defining Zuniga's claims for direct and bystander damages. On the general negligence theory, the jury was instructed that Zuniga claimed she was harmed because of the way Cherry Avenue managed its property and that, to establish this claim, she had to prove (1) Cherry Avenue was negligent in the use or maintenance of the property, (2) she was harmed, and (3) Cherry Avenue's negligence was a substantial factor in causing her harm. In addition, the jury was instructed that Zuniga claimed she suffered serious emotional distress as a result of perceiving the fatal injury to her husband and that, to establish this claim, she had to prove (1) Cherry Avenue negligently caused an injury to her husband; (2) when the electrocution occurred, she was present at the scene; (3) she was then aware that the electrocution was causing injury to her husband; (4) she suffered serious emotional distress; and (5) Cherry Avenue's conduct was a substantial factor in causing her serious emotional distress. (See CACI No. 1621 [bystander recovery of damages for emotional distress].) The jury was told Zuniga "need not have been aware that [Cherry Avenue] had caused the electrocution." "Emotional distress" was defined as including "suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame. Serious emotional distress exists if an ordinary reasonable person would be unable to cope with it." (See CACI No. 1621.) The jury instructions also stated the damages Zuniga claimed were: "Past and future physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress."

The jury instruction's listing of the types of damages Zuniga claimed, together with the special verdict form's use of the phrases "Direct Injury Emotional Distress Damages" and "Bystander Emotional Distress Damages", caused the jury to ask a question about awarding physical damage. After receiving input from counsel, the court told the jury it had placed a mark on one of the instructions it was about to mention in answering the jury's question and then stated:

21.

"Plaintiff claims [that] you can award damages for past and future physical pain, physical impairment, and all other damages detailed in the jury instruction I marked.  These past and future physical pain and physical impairment damages would be awarded in response to question number four, past direct injury emotional distress damages, and future direct injury emotional distress damages if you decide to award such damages."

As a result of this instruction, the labels "Past Direct Injury Emotional Distress Damages" and "Future Direct Injury Emotional Distress Damages" for the first two categories of damages addressed in question No. 4 of the special verdict form were underinclusive because those categories were to include damages for injuries other than emotional distress.  In comparison, the last two categories addressing past and future "Bystander Emotional Distress Damages" were limited to emotional distress.

The jury was instructed that in determining Zuniga's noneconomic damages for her wrongful death claim, they were not to consider (1) her "grief, sorrow, or mental anguish"; (2) her husband's pain and suffering; or (3) the poverty or wealth of Zuniga.  It appears this instruction is why Cherry Avenue does not contend the wrongful death damages awarded in response to question No. 3 were duplicative of the bystander emotional distress damages.

### 3.    *Closing Arguments*

Zuniga's counsel told the jury it was "going to decide what is the reasonable value for the lifetime of loss for three different harms she suffered:  Her direct injury, which she was electrocuted and suffered those injuries she talked about and was hospitalized.  The second injury is that horrifically witnessing the death of her husband and experiencing it right before her eyes.  The law recognizes that as its own claim.  It's called a bystander claim.  And the third loss is the loss of her husband's love."  Summarizing the point, counsel stated "three different types of harm were caused by [Cherry Avenue's] negligence."

Addressing the wrongful death damages, counsel told the jury the judge would define this component using the words "companionship, comfort, care, assistance,

22.

affection, society, moral support, protection guidance, [and] sex" and those were the words the jury should use to evaluate what was taken from Zuniga. Counsel argued the value of these items and love was "about a million dollars a year" and noted Zuniga's life expectancy was 43 years. Counsel stated five years had passed since the incident and said, "you are going to have a question that says past and future, I wrote five million past, 45 million future."

Counsel addressed the first two categories of damages listed in question No. 4 of the special verdict form by stating: "[W]e have past, direct emotional distress, two million dollars that's for her physical and mental injuries for being electrocuted herself. We then have future for the personal injuries she suffered, that's two million." Addressing the final two categories of damages listed in question No. 4, counsel stated: "Then the bystander is separate emotional distress, and that is just literally being present when her husband is electrocuted right in front of her. That in and of itself for the last five years is worth ten million. And then for the rest of her life living with that experience and memory is worth 15 million."

The closing argument of counsel for Cherry Avenue focused entirely on issues related to liability. He stated "that this is a simple case. We are talking about overhead power lines." He argued that "from [a] young age, we are taught if we encounter a[n] electrical line outside, stay away." He asserted that one did not need to assess whether the lines were energized to properly and prudently look out for one's own safety. Cherry Avenue's counsel argued the evidence soundly established that the negligence of Zuniga and her husband were a substantial factor in causing his death. Referring to CACI No. 1004, he stated that a landowner must use reasonable care to protect against the risk of harm from an unsafe condition on property if it is foreseeable that the condition may cause injury to someone who, because of necessity, encounters the condition. Cherry Avenue's counsel argued there was no necessity for Zuniga and her husband to hoist a

23.

28-foot tall flag as part of their stand, but they choose to do so, and Cherry Avenue should not be blamed for that choice.

In his concluding argument, Zuniga's counsel went through the special verdict form's questions. In addressing damages, he reiterated that he had asked for five million for past wrongful death damages and 45 million for future wrongful death damages and then said, "It's up to you." Next, counsel stated: "Two million for past direct injury damages. Two million for future direct injury damages. Ten million for bystander, what happened at the time of the incident: she felt, tasted, touched, heard it. And then 15 million for living with that distress and pain of having experienced the most horrific event we can all imagine."

### 4. Rule Against Duplicative Damages

In *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590 (*Plotnik*), a dispute arose between neighbors and they entered into a settlement agreement. The antagonism continued and plaintiffs, a husband and wife, sued the neighbor and his two adult sons, alleging breach of the settlement agreement, assault, trespass to personal property (their 15-pound dog), negligence, conversion, intentional infliction of emotional distress, and negligent infliction of emotional distress. (*Id.* at pp. 1598–1599.) First, the jury found the neighbor had breached the settlement agreement and awarded emotional distress damages of $35,000 to the husband and $70,000 to the wife. (*Id.* at p. 1598.) Second, the jury found the neighbor had committed a trespass against the dog and awarded husband $2,600 in economic damages and $20,000 in emotional distress and awarded wife $209.53 in economic damages and $30,000 in emotional distress. (*Id.* at p. 1599.) Third, the jury found the neighbor negligently interacted with the dog and awarded husband emotional distress damages of $16,150 and wife emotional distress damages of $30,000. (*Ibid.*) Fourth, on the claim for intentional infliction of emotional distress, the jury awarded husband emotional distress damages of $30,000 and wife emotional distress

24.

damages of $75,000.  (*Ibid*.)  Fifth, on the claim for negligent infliction of emotional distress, the jury awarded husband emotional distress damages of $30,000 and wife emotional distress damages of $50,000.  (*Ibid*.)  After post-trial motions and plaintiffs' acceptance of remittitur, the trial court entered an amended judgment that could be interpreted as eliminating the recovery of either the intentional or the negligent infliction of emotional distress claim.  (*Id*. at p. 1600.)

On appeal, the neighbor argued the damages needed to be reduced further because they were duplicative.  (*Plotnik*, *supra*, 208 Cal.App.4th at p. 1600.)  Specifically, the neighbor argued the jury's special verdict awarding plaintiffs emotional distress damages under several different legal theories constituted duplicate damages for the same transactional event and, thus, violated the rule against double recovery.  (*Id*. at p. 1612.)  To address this argument, the appellate court set forth the following legal principles:

> " 'The primary right theory ... provides that a "cause of action" is comprised of a "primary right" of the plaintiff, a corresponding "primary duty" of the defendant, and a wrongful act by the defendant constituting a breach of that duty.  [Citation.] The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action.  [Citation.] ... [¶]  As far as its content is concerned, the primary right is simply the plaintiff's right to be free from the particular injury suffered.  [Citation.]  It must therefore be distinguished from the legal theory on which liability for that injury is premised: "Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief."  [Citation.]' (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 681–682 [34 Cal.Rptr.2d 386, 881 P.2d 1083]; see also *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 798 [108 Cal.Rptr.3d 806, 230 P.3d 342].)

> "Thus, where a party 'ha[s] alleged the existence of but one primary right, and but one violation of that right,' the 'complaint states but one cause of action, even though two or more theories of recovery are alleged. [Citation.]' [Citation.]  'Regardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence.  [Citation.]  Double or duplicative recovery for the same items of

damage amounts to overcompensation and is therefore prohibited. [Citation.]' [Citations.]" (*Plotnik*, *supra*, 208 Cal.App.4th at p. 1612.)

Applying these principles to the special verdicts, the appellate court determined a duplicative recovery had occurred. The court stated: "The special verdicts allowed recovery of emotional distress damages for [the neighbor's] injuring [the dog] under theories of negligence and trespass to personal property, plus potentially as part of the damages awarded for both intentional and negligent infliction of emotional distress." (*Plotnik*, *supra*, 208 Cal.App.4th at p. 1612.)

Ultimately, the appellate court upheld the plaintiffs' recovery of emotional distress damages under the breach of contract claim ($35,000 for husband and $70,000 for wife) and the trespass to personal property claim ($20,000 for husband and $30,000 for wife) and overturned the other awards of emotional distress. (*Plotnik*, *supra*, 208 Cal.App.4th at pp. 1603, 1608.) The court concluded the plaintiffs' recovery of emotional distress damages on both their claim for negligent interaction with the dog and their claim for negligent infliction of emotional distress was legally erroneous because those damages were already recovered under the breach of contract claim and the trespass to personal property claim. (*Id*. at p. 1613.) To summarize, *Plotnik* illustrates a duplicative award of emotional distress damages under multiple, overlapping legal theories.

C.     Bystander Emotional Distress

Based on the principles set forth in *Plotnik* and the cases cited therein, we conclude Zuniga "is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence." (*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158.) In other words, "duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited." (*Id*. at p. 1159.) However, "where separate items of compensable damage are shown by distinct and independent evidence, the plaintiff is entitled to recover the entire amount of [her] damages, whether

26.

that amount is expressed by the jury in a single verdict or multiple verdicts referring to different claims or legal theories." (*Ibid*.)

Based on these legal principles, we conclude the issue presented in this appeal is whether the damages awarded as past and future "Direct Injury Emotional Distress Damages" are separate, distinct items of compensable damage when compared to the past and future "Bystander Emotional Distress Damages." As explained below, we conclude the quoted phrases signify—at least for purposes of this case—different items of damage attributable to different injuries. As a result, the jury did not award duplicative damages.

First, a simple examination of the amounts awarded in each category undermines Cherry Avenue's contention that the direct injury emotional distress damages included the bystander emotional distress damages. Both the past and future bystander emotional distress damages—$2 million and $4 million, respectively—were larger than the awards for past and future "Direct Injury Emotional Distress Damages," which were $1 million and $2 million, respectively. It is basic arithmetic that a smaller number does not include a larger number. Thus, Cherry Avenue's claim that the $6 million past and future bystander damages were included in the $3 million past and future direct damages does not correspond with the size of the awards.

Second, the manner in which the case was presented to the jury created damages for three distinct types of injury. As described earlier, Zuniga's counsel told the jury during closing arguments it was "going to decide what is the reasonable value for the lifetime of loss for three different harms she suffered."

The first harm addressed in the special verdict form was the wrongful death of Zuniga's husband. The jury instructions defining the wrongful death damages excluded the emotional distress damages caused by the loss of her husband and Cherry Avenue does not contend otherwise. (See pt. III.B.2., *ante*.)

The second type of harm addressed in the special verdict was that experienced directly by Zuniga as a result of being electrocuted. Her counsel described this type of

harm, stating: "Her direct injury, which she was electrocuted and suffered those injuries she talked about and was hospitalized." As made clear by the trial court's answer to the jury's question of physical damages, the "direct injury" category included Zuniga's physical injuries and the emotional distress that she experienced as a result of her being electrocuted. Zuniga would have experienced these injuries and the attendant damages if her husband had not been present—that is, if she alone had been electrocuted. For instance, if her husband had not been there that day, Zuniga still would have spent two days in the hospital for her burns and the burns still would have taken seven months to heal. Zuniga testified that from the date of the incident "until the present date, I feel pain in my feet, I feel pain in my hands. And when it's cold, I feel pain when my – my skin get dry, it hurts." She also stated (1) it bothers her to step on a cold floor; (2) when she sticks her feet in water, it hurts; and (3) when she walks barefoot, she feels pain and itching in her feet. When asked if she experienced the pain "pretty much every single day," Zuniga answered, "Yes." This and Zuniga's other testimony supports the jury's award of damages for past and future direct injuries.

The third type of harm addressed in the special verdict was the bystander emotional distress damages. Zuniga's counsel described this harm in his closing statement as the injury from "horrifically witnessing the death of her husband and experiencing it right before her eyes." The damages for this type of harm were limited to the emotional distress, past and future, resulting from Zuniga being present when her husband was electrocuted and died. Zuniga would have been entitled to recover for this distinct item of compensable damage even if she had not been electrocuted but had simply been present to witness her husband's electrocution. (CACI No. 1621 [essential elements for recovery of emotional distress damages by a bystander with no direct injury].)

We recognize that Zuniga, as a direct victim of Cherry Avenue's negligence, was entitled to recover for all her emotional distress, regardless of whether it was caused by

28.

her own electrocution or by perceiving the injury and death of her husband. We conclude the fact that distinct categories of emotional distress were presented to the jury does not automatically mean that there was a duplicate recovery. In the circumstances of this case, the direct injury emotional distress and the bystander emotional distress constituted a "distinct item of compensable damage supported by the evidence." (*Tavaglione v. Billings*, *supra*, 4 Cal.4th 1150, 1158.) Consequently, we reject Cherry Avenue's contention that the jury awarded duplicative damages. As a result, we do not reach Zuniga's argument that Cherry Avenue forfeited this contention by failing to raise objections in the trial court at a time when the purported error could have been corrected.

D.     Contemporaneous Awareness

In *Thing v. La Chusa* (1989) 48 Cal.3d 644, the California Supreme Court held "that a plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, but only if, said plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress .…" (*Id*. at pp. 667–668.) The court referred to "the traumatic emotional effect on the plaintiff who contemporaneously observes both the event or conduct that causes serious injury to a close relative and the injury itself." (*Id*. at p. 667.)

Cherry Avenue contends Zuniga was unconscious and had no understanding of the injury-causing event or of her husband's injury and death until *after* the incident. Cherry Avenue argues Zuniga presented *no evidence* that she contemporaneously observed the electrocution or understood it caused her husband's injury. (See *Ewald v. Nationstar Mortgage, LLC* (2017) 13 Cal.App.5th 947, 948 [arguments should be tailored to the applicable standard of review].) We reject this argument.

29.

First, we interpret the Supreme Court's reference to a plaintiff "who contemporaneously observes" the event and the injury itself to mean the plaintiff *perceives* the event. (CACI No. 1621.) The Directions for Use to CACI No. 1621 explicitly recognizes "[t]here is some uncertainty as to how the 'event' should be defined … and then just exactly what the plaintiff must perceive" to satisfy the instruction's element addressing the plaintiff's awareness that the event was causing the victim's death or injury. Under the facts of this case, plaintiff clearly perceived the event that caused her husband's death through her sense of touch when she was electrocuted and felt cold. Furthermore, the jury could reasonably find that she was aware the event that knocked her momentarily unconscious was causing the death of her husband. When she awoke, she saw her husband lying on the ground and ran to him. A jury could reasonably infer Zuniga determined whatever had happened to her also happened to her husband. Thus, we conclude the evidence is sufficient to uphold the jury's finding that she perceived *the event* that caused her husband's death.

Next, we consider whether she "was then aware [the event wa]s causing injury to the victim." (*Thing v. La Chusa*, *supra*, 48 Cal.3d at p. 668.) Zuniga testified that after she reached her husband she spoke to him, urging him to be strong and begging him not to leave her. When asked if her husband said anything back to her, Zuniga replied, "No, he just moved his lips, and that was it." Zuniga's testimony adequately supports a finding of fact that Zuniga was aware the event that injured her was injuring her husband. His experience of those injuries was not limited to the time Zuniga was unconscious. Instead, he was still experiencing them when she reached him, and she saw him die (his final injury) while trying to speak to her. Therefore, Cherry Avenue has not shown the jury's findings are not supported by any evidence.

30.

IV.    COSTS*

Cherry Avenue's appellate briefing states "this court should reverse the cost award for the same reasons that it should reverse the judgment and Cherry Avenue does not otherwise independently challenge the cost award." Based on this statement and our affirmance of the judgment, we also affirm the award of costs.

## DISPOSITION

The judgment is affirmed. Respondent shall recover her costs on appeal.


FRANSON, Acting P.J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.

---

*        See footnote, *ante*, page 1.

31.